ALPHA RUF SHELP, Appellant, v. MERCANTILE TRUST COMPANY, as
Trustee.—15 S. W. (2d) 818.

Division One, March 29, 1929.

*Jones, Hocker, Sullivan & Angert, Conway Elder, L. Frank Ottofy, A. E. L. Gardner* and *P. H. Cullen* for appellant.

*S. A. Mitchell, Carter, Jones & Turney* and *H. R. Small* for respondent.

RAGLAND, J.—This case comes to the writer on reassignment.

Frank A. Ruf, a citizen and resident of the city of St. Louis, died testate, on the 28th day of May, 1922, seized and possessed of an estate, consisting of both real and personal property, of the approximate value of two and a half million dollars. He left surviving a widow, Alpha Ruf, but no child, unless plaintiff was a child by adoption. Under his will his wife was generously provided for and modest legacies were given to certain of his collateral kindred and to certain of his former employees; but the bulk of his estate was given and devised to the defendant in trust for designated public charities. The plaintiff was not named or referred to in the will. This action is for the partition of the real estate. The only controverted issue tendered by the petition appears from the following excerpt therefrom:

"That the plaintiff was, at an early age, by and with the consent of her then only surviving natural parent, taken into their home by the said Frank A. and Alpha H. Ruf and was treated and held out by them as their daughter, and encouraged to believe, and given to understand, that she was taken into their home as a daughter; that they, and particularly the said Frank A. Ruf, received the benefits accruing to him on account of that relation, while the plaintiff assumed and performed, during her minority and until her marriage and during a period of eleven years, the duties and burdens, and performed the services and gave the companionship and attention of a daughter, whereby plaintiff became invested with the status of and is the adopted daughter of the said Frank A. Ruf, and, as such, entitled to institute and maintain this suit as the pretermitted heir at law of the said Frank A. Ruf."

Those allegations were denied generally and specifically, and the Statute of Frauds was also pleaded in bar.

The evidence heard on the trial below was voluminous and took a wide range. The court indulged counsel generously in their search for hidden motives and secret springs of action. We shall attempt to deal with tangibles only. And our first endeavor will be to set

forth in general outline the facts which are conceded or shown by the evidence to be uncontrovertibly true.

Plaintiff is the daughter of Caroline Hatch and Charles S. Hatch, now deceased; she was born in Buffalo, New York, where her parents resided, on the first day of September, 1898; she was christened Alpha Ruf Hatch. Alpha H. Ruf, the wife—now the widow—of Frank Ruf, and plaintiff's mother are sisters: Mrs. Ruf is the elder of the two by thirteen years. She married Ruf in 1897 at the home of plaintiff's parents in Buffalo. She was at the time a widow, and had previously resided in St. Louis where Ruf was engaged in business, that of manufacturing and selling a proprietary remedy known as Antikamnia. After their marriage the Rufs resided at 5863 Cabanne Avenue, St. Louis; they were frequent visitors at the Hatch home in Buffalo.

Charles S. Hatch was a lawyer; he died August 22, 1910, after an illness of several years' duration; in addition to his wife, Caroline, and his daughter, Alpha, he was survived by a son, Charles, who was four years older than the daughter. He left no estate; but his widow came into possession of a policy of insurance on his life under the terms of which she was to receive, and did receive, an annuity of $1000 for a period of ten years. Prior to their father's death Charles and Alpha attended the State Normal School of Practice at Buffalo; following his death, Charles was entered, in January, 1911, as a student in the Michigan Agricultural College. He continued there as such until his graduation in June, 1915. In the latter part of January, or the first part of February, 1911, Mrs. Hatch, at the urgent insistence of her sister and the latter's husband, moved from Buffalo to St. Louis to reside, and with her daughter, Alpha, occupied a small apartment, which the Rufs had rented for her, in the immediate vicinity of their home. After living in the apartment four or five months Mrs. Hatch, upon the invitation of her sister and brother-in-law, quit the apartment and made her home with them, she and her daughter thereby becoming members of the Ruf household. The mother and daughter were given for their occupancy a large room which was known as the guest room: they were treated in all respects by Mr. and Mrs. Ruf as members of their family. From January to July, 1912, the Rufs traveled in Europe and left Mrs. Hatch in charge of the home and servants.

In September, 1911, Mrs. Hatch entered her daughter, Alpha, as a pupil in the Dozier School, one of the public schools of the city of St. Louis. After attendance at the Dozier School for something over a year, she was placed in the Bishop Robertson's Hall, a private school. She continued there until June, 1914, her tuition being paid by Mr. Ruf.

During the early summer of 1914 Mr. Ruf began drinking heavily: he came home in the evenings in various stages of intoxication. At

such times he was rough and perhaps harsh in manner, though never mistreating any member of his family, and his language was often coarse and vulgar. The situation became very distasteful to Mrs. Hatch, and she determined upon a course that would remove herself and her daughter from the uncongenial atmosphere. When the Bishop Robertson's Hall school closed for the summer vacation in 1914, she, without previous consultation with the Rufs with respect thereto, took her daughter East for the purpose of placing her in a school there. She finally consummated arrangements for entering Alpha in the Dean Academy at Franklin, Massachusetts. They then returned to the Ruf home where they remained until September. At that time they again went East, Alpha entering Dean Academy as a resident pupil, and Mrs. Hatch taking a position in the State Reformatory for Women at Bedford Hills, New York.

In September, 1915, Mrs. Hatch married a Mr. Adams and with her husband again took up residence in Buffalo. Her daughter, Alpha, continued as a pupil at Dean Academy until she graduated from that institution in June, 1917. During the three years of her attendance there it was her custom to spend a part of each vacation period with her mother in Buffalo and a part with her uncle and aunt in St. Louis. At Christmas time she would visit her mother first, staying until after Christmas day, and then go to St. Louis for the remainder of the holiday. The first two weeks of her Summer vacation—June to September—she would spend with her mother and the remainder with her uncle and aunt. Mrs. Adams does not seem to have improved her financial condition by her second marriage: notwithstanding, the home of herself and her husband was open to her daughter. That young lady, however, greatly preferred that of her well-to-do uncle and aunt; and there she spent the greater portion of her time while not actually in attendance at school.

In January, 1917, the Rufs were planning an extended trip to California and other places of interest: they invited Alpha and she expressed an intention of accompanying them: this brought a vigorous protest from her mother, on the ground that such a prolonged absence from school would prevent her graduation in the following June. Alpha announced that of course she would not go without her mother's consent. The matter was then taken up with the head of the academy and an understanding of some kind was reached whereby she could go on the trip and still complete her course within the time contemplated.

Upon Alpha's graduation at the Dean Academy, Mrs. Adams wanted her daughter to go to Vassar for a year, or to take a special course in chemistry, in which she had manifested some proficiency: a friend had offered to furnish the necessary financial means. But Alpha appeared unwilling to do either; with her mother's reluctant acquies-

cence she returned to the home of the Rufs, where she remained two and a half years—until her marriage February 3, 1920. During that period she made occasional visits to her mother of from one to two weeks duration.

Setting out in January, 1918, the Rufs, their niece accompanying them, spent two months traveling and visiting on the Pacific Coast; they made a similar trip at the beginning of the year 1919. In the year 1918, plaintiff according to her own statement, began to seriously consider getting married, and therefore to desire the contacts afforded by a broader social life than she was then enjoying. In the Spring of 1919 she became engaged to Mr. Willard B. Shelp, Jr., who is now her husband. This engagement was broken after a short duration. On July 3, 1919, Mrs. Ruf, at her niece's instance, gave an "at home" to which many guests were invited. The card of invitation read as follows:

"Mrs. Frank A. Ruf, Miss Alpha Ruf Hatch,
at home on Thursday, July Third,
from Four to Six O'clock.
"5863 Cabanne Avenue."

At Thanksgiving in 1919, plaintiff and Mr. Shelp renewed their engagement; they were married at the home of Mrs. Riddle, a near neighbor of the Rufs, February 3, 1920. Plaintiff had previously conferred by letter with her mother as to the form the announcement of the marriage should take. Following the suggestions that her mother had given her, plaintiff after her marriage sent out to her various friends and acquaintances the following announcement:

"Mr. and Mrs. Albert Henry Adams
Have the Honor of Announcing
The Marriage of their Daughter,
Alpha Hatch, to
Mr. Willard Bailey Shelp, Jr.,
On Wednesday, February 4th,
Nineteen Hundred and Twenty,
St. Peter's Episcopal Church,
St. Louis."

When plaintiff first announced to her uncle and aunt her intended marriage, it met with unyielding disapproval on their part. Mr. Ruf gave expression to his disapproval in vigorous language: he "stormed and swore" and said many unkind and harsh things about his niece's fiance. Notwithstanding, the plans for the wedding proceeded: the time and place were fixed: February 11, 1920; St. Peter's Episcopal Church, St. Louis: the trousseau was purchased and all arrangements completed, prior to January 10, 1920. On that day Mr. Ruf was

leaving for Washington on business and Mrs. Ruf was accompanying him; it was understood that both would return in time for the wedding. After they had gone, plaintiff and her husband-to-be, apparently nursing the unkind things that had been said by Mr. Ruf and becoming indignant thereat, advanced the day of their marriage, and were thereafter married at Mrs. Riddle's before his and Mrs. Ruf's return. The day following her marriage, plaintiff mailed to Mrs. Ruf a letter of which the following is a copy:

''Dear Auntie:

''Inclosed please find checks for articles purchased, being in absolute need of them before marrying. I wish you always to remember I am grateful to you and your husband for all you have done for me.

''I have gone absolutely out of your life and I trust you will now be happy.

''Am sorry to have broken my promise to you about waiting your return, but my husband refused, under the circumstances, to wait longer.

''Most sincerely,
''(Signed) ALPHA HATCH SHELP.

''February the third, nineteen twenty.''

Plaintiff continued to reside in the city of St. Louis, but there was never any intercourse between her and the Rufs after her marriage.

Plaintiff's mother not only approved of her marriage, but expressed gratification that she was about to withdraw from a state of dependency and from the unwholesome atmosphere of the Ruf home (her mother so regarded it) and live a life of her own.

Comparatively early in life Frank A. Ruf by his own unaided efforts acquired great wealth. He was very generous with the kinspeople of both himself and his wife who were less fortunately situated: he seemed to derive great pleasure from sharing his prosperity with them. Some of them were always in his home, coming for indefinite stays; some were clothed and schooled by him; and some he took with himself and wife on trips to Europe and elsewhere, paying all the expenses and bestowing presents upon them with lavish hand. He sent three of his nephews, sons of a brother who resided in Des Moines, Iowa, to Culver Military Academy. One of these, Edward Ruf, was taken into the Ruf home the latter part of the year, 1907. He was thereafter supported, educated and provided for as though he were a son instead of a nephew. Except for temporary absences and during service in the World War he continued as a member of the Ruf household until sometime after plaintiff's marriage. In his uncle's will he was given a legacy of $5000 and no more.

Because of the straitened circumstances of the Hatch family, resulting from Mr. Hatch's long protracted illness, Mrs. Ruf for many years prior to his death provided clothing for Mrs. Hatch and her children. After Mrs. Hatch and her daughter came to St. Louis

they were maintained by Mr. Ruf, until Mrs. Hatch left in 1914. Mrs. Hatch paid out of her annuity Alpha's tuition at the Dean Academy, but her clothing, traveling expenses and spending money were all furnished by Mr. Ruf. After her graduation at Dean she was dressed and showered with attentions by the Rufs as though she was "the daughter of the house."

Ruf manifested quite an interest in plaintiff while she was still a small child and in the home of her parents in Buffalo. After she came with her mother to St. Louis, he became "foolishly" fond of her. He had her sit by him at the table and sit by him when riding in the car; when he came home in the evening, he would take her upon his lap and kiss and fondle her; he called her pet names of the most extravagant character; he had pictures taken with her; and he had a picture of her, taken when she was quite small, enlarged and hung above the head of his bed. These attentions won her completely and she gave him in return a most ardent devotion. If she did not go down in the city with the chauffeur to bring her uncle home in the evening, she met him at the door, kissed him, brought his house-jacket and slippers and took his shoes off and put his slippers on. (It appears, however, that this service was always rendered him by some female member of his family: if no nieces or cousins were at hand, then by Mrs. Ruf.) It was said that Ruf was a most unusual character for his time, in that he was the supreme master in his own house: he dominated every one in any way connected with it, while in it: when he appeared every one stepped lively to administer to his wants or to his whims; that was particularly true during the times of his periodical sprees. On some of these occasions if "Babe," as he called her, was not in sight, she had to be gotten, whether she was at church or in bed. When she would appear, he would have her either play cards with him, or else narrate her doings of the day; he indulging in a rapid fire of humorous comment as she proceeded. When he was under the influence of liquor, she seemed to have more influence with him than others in getting him to act reasonably. The influence was frequently called into requisition: she was often sent down town with the chauffeur to bring him home when he was on one of his sprees. When he suffered from rheumatism or gout, as he often did, she rubbed his feet and limbs; she rendered him many little personal attentions.

While plaintiff was at Dean her uncle wrote her almost daily, often sending letters by special delivery, and he frequently sent her telegrams. He selected her dress for graduation, and on that occasion he gave her a diamond bar pin. After her graduation and after she came back to St. Louis, she devoted herself assiduously to the doings of the things that pleased him and ministered to his comfort and happiness; in return she received all the benefits, tangible and intangible, that a home such as his was calculated to bestow. There

can be no question but that he was extremely fond of her and that she had a very great affection for him.

Plaintiff called Mrs. Ruf Aunt or Auntie: she called Mr. Ruf Uncle Frank or "Unkie." There is no pretense that the Rufs or either of them ever held plaintiff out, either to the public or to their circle of friends and acquaintances in St. Louis, as their daughter, or their adopted daughter, or their intended heir. In a general way she was known as a niece of the Rufs who was making her home with them. But there is evidence in the record of specific statements made from time to time and under varying circumstances which must be taken into consideration. These will be now noted. And first those testified to by plaintiff:

In June, 1910, during Mr. Hatch's last illness, the Rufs were visiting in his home. With respect to an occurrence at that time (Mr. Hatch, Mr. Ruf, Mrs. Ruf, Mrs. Hatch and plaintiff being present) plaintiff testified:

"My father said to Mr. Ruf, 'I am worried about Alpha's welfare; will you please take her and make her your own, as I don't want her under Carrie's influence.' Carrie, or Caroline Alpha, is my mother's name, and he referred to my mother, and my uncle responded and he said, 'I will take her now,' and I looked over to my uncle and he said, 'How about it, Carrie,' and my mother shook her head. . . . We (my uncle and I) went down to the ticket office, and my uncle said, 'Now you are my little girl; you are my little daughter, and I will take you home with me,' and he kept on talking in that manner until we reached the ticket office, and we found that it was closed, and it was necessary for us to go down to the station, which is at the foot of Main street, to buy the ticket, and at the ticket office he said to the man, 'I want another ticket,' and I said, 'Please, I don't want to leave my mother.' "

This testimony of plaintiff was not corroborated by her mother: Mrs. Ruf denied that any such incident occurred or that any such conversation took place.

In 1915, pending her mother's engagement to Mr. Adams, plaintiff testified that she had a conversation with Mrs. Ruf with reference to her mother's approaching marriage. As to this she testified:

"My aunt . . . told me how much I meant to her and to my uncle, and that she wanted me to continue to live with them after my mother married; that her marriage made it possible so she could raise no objection, and what it meant to me, the advantages I would have that my mother could not give me, and that I would have everything that I wanted, and what it meant in the future, that it meant that I could provide for my mother."

Mrs. Ruf on the stand denied that she ever said anything of the kind.

Plaintiff had an uncle in New York, Judge Hatch: on their way home following her graduation she stopped in New York and she and Mrs. Ruf went to his office. On that occasion Mrs. Ruf said to Judge Hatch: ''Well, Ed, what do you think of my daughter now?'' Mrs. Ruf testified that she made no such statement; that on the contrary she said, ''Well, Ed, what do you think of your niece now?'' (Judge Hatch at the time of the trial was dead.)

With respect to a conversation or conversations had in 1918 plaintiff testified:

''In 1918 when I wanted to become a nurse. I had two friends in the East who had entered training, two school girl friends, and I was very desirous of taking up a course of nursing. . . . We had many conversations about it, because he (Ruf) objected strenuously, and I said, 'Well, I think it is nice that a girl may know something to earn her own living.' And he said to me, 'Well, you will never have to earn your own living because you will have everything I have and I don't want you to.' . . . I did not (take up nursing).''

Plaintiff said that her aunt was present when these conversations were had, but Mrs. Ruf had no recollection of them whatever.

On one occasion during the trip to California in 1917, Mr. Ruf said to plaintiff (according to her testimony): ''Well, 'Baby,' you didn't know you were my daughter, did you? You go over there— I registered you as my daughter.'' A number of photostatic copies of pages from hotel registers were offered in evidence: they disclosed that sometimes Ruf registered plaintiff as ''Miss Alpha Ruf,'' but more frequently as ''Miss Alpha Ruf Hatch.''

In 1915 in connection with a conversation with reference to her continuing to live with the Rufs after her mother's marriage, Mr. Ruf said to plaintiff (according to her testimony) : ''Well, you know your father gave you to me.''

Plaintiff further testified:

''Ed. Ruf (in 1917) had failed to pay his taxicab bill, and my uncle was very perturbed about it, because he said he wasn't any good and he was just hanging around for what he would get. . . . And he said, 'He will never get a cent.' He said, 'You are my only heir,' to me. . . .

''In 1918 . . . when I was coming home in the machine with him (Ruf) he was talking about marrying and he said to me, 'A girl in your position should not marry a man who makes less than $500 a month.' . . . And he said to me, 'Well, you will never have to worry. I have provided for you.' . . .

''Well, as I said, he said he (Shelp) was no good, and that he was marrying me for money, and that I was making the mistake of my life, and that I had no business to marry, I was too young and I did not know my own mind, and that I was giving everything for

nothing, and that after I was married I would regret it. . . . He told me he would disinherit me if I married him.''

Kandeler, a photographer, testified that Ruf brought plaintiff to his studio in 1911 to have a picture made of her, and on that occasion Ruf told him that ''he wanted a picture of his little daughter taken like that famous Rembrandt's picture, 'Sweet Innocence.' ''

Plaintiff testified that on trips taken during the first part of each of the years, 1917, 1918 and 1919, she was introduced by her uncle as his daughter to strangers they encountered; it further appeared from her testimony, however, that if the persons to whom she had been so introduced were met frequently enough to become fairly acquainted with her uncle's party, it was explained to them that she was his niece and not his daughter.

Mrs. Ruf testified that plaintiff was not taken into their home as a daughter; that there was never any thought either on the part of herself or that of Mr. Ruf of adopting plaintiff. There was evidence, however, that in talking with a victrola salesman on one occasion she referred to plaintiff as her daughter, and that on another occasion she told a dressmaker who was making a dress for Alpha that Alpha was her sister's child, but that she and Mr. Ruf had adopted her.

Mrs. Adams, plaintiff's mother testified:

''Q. Now, the question, Mrs. Adams, I wanted to ask you was whether at any time you had any information or advice or notice that your daughter was regarded or treated as a daughter of either Frank A. Ruf or Alpha H. Ruf, or both of them? A. I never thought anything about it. She simply lived with them the same as Ned Ruf lived with them. She was simply a member of the family, and she was in the household. I never heard of any adoption. . . .

''Q. In this petition it is stated that plaintiff was at an early age, by and with the consent of her then only surviving parent—and it refers to all that I have recited and read to you; did you at any time consent that your daughter might be adopted by Mr. Ruf or Mrs. Ruf, or both of them? A. It was never suggested. I could not consent to something that was not before us.''

Edward Ruf, sometimes referred to as Ned Ruf, testified:

''Q. Now, while here in the summer of 1917 you say you had something to do with the calvary in Forest Park, a troop? A. Yes, sir; I was commanding the troop.

''Q. At that time did you see the plaintiff? A. Yes, sir.

''Q. Did you have occasion and did you talk with her? A. Yes, sir; we used to go riding considerably, we were at the house together all the time.

''Q. She rode horseback? A. Yes, sir.

''Q. Now, what if anything was said by her, as to her being in St. Louis, and not with her mother at that time? A. Why, she was

694

talking one day, I don't remember her exact words, but the statement was made about Mr. Adams, that she had never cared about Mr. Adams and did not like him particularly, and that she did not want to go back to Buffalo and live with her mother at that time on that account; she also stated that should she go back to her mother at Buffalo, she would have to go to work."

The foregoing is an epitome of all the substantial relevant evidence.

The trial court found the issues for the defendant and gave judgment accordingly; this appeal on the part of the plaintiff followed.

I. Taking advantage of the vague, indefinite and somewhat ambiguous allegations of her petition, appellant insists that she is entitled to recover under either of two legal theories. These are not necessarily inconsistent, but they involve separate and distinct grounds of recovery. The first one she invokes had its origin, so far as the jurisprudence of this State is concerned, in Rauch v. Metz, 212 S. W. 357; it came to full maturity in Holloway v. Jones, 246 S. W. 587. It is fully set forth in the following excerpts from the opinion in the case last named at pages 590 and 593, respectively:

"For the purposes of this case it matters little whether we regard the act of adoption as a status voluntarily assumed with the parental duties and burdens imposed by the statutes with the corresponding benefits inuring to the adopted child (R. S. 1899, par. 5248), or as a contract of which the child is the beneficiary; their respective rights, obligations, and duties are the same, and these have been enforced in equity by the courts of this State in numerous cases, some of which are the following: (naming them). In all these cases it is held, in substance, that one who takes a child into his home as his own, receiving the benefits accruing to him on account of that relation, assumes the duties and burdens incident thereto, and that where justice and good faith require it the court will enforce the rights incident to the statutory relation of adoption. The child having performed all the duties pertaining to that relation, the adopting parent will be estopped in equity from denying that he assumed the corresponding obligation. In equity it will be presumed that he did everything which honesty and good conscience required of him in justification of his course. . . . The defendant contends that she was the adopted child and heir of Mrs. McHaney and that the succession was thereby diverted to herself. Her adoption is therefore a matter of fact, the burden of proving which lies upon her, and it is necessary for her to establish it by evidence so clear and convincing as to satisfy the mind of the chancellor beyond a reasonable doubt."

The doctrine in brief is: where one takes a child into his home *as his own,* thereby voluntarily assuming the *status of parent,* and

by reason thereof obtains from the child the love, affection, companionship and services which ordinarily accrue to a parent, he is thereafter estopped to assert that he did not adopt the child in the manner provided by law.

Applying the doctrine just stated to the facts in this case, it is perfectly clear that Ruf did not take plaintiff into his home *as his child*, that he did not assume with reference to her the *status of parent*. She entered his home with her mother in the early part of 1911, and on the same footing as her mother. Both became members of his family, and so remained for a little more than three and a half years—until September, 1914. During all of that time she was in the custody and under the control of her mother, and no one else: Ruf did nothing to displace or even encroach upon the mother's parental authority. Plaintiff's mother took her into Ruf's home in 1911; she took her out in 1914. She then matriculated her at Dean Academy, and kept her there as a pupil, under her own control and supervision—unshared by anyone—until she graduated in June, 1917. She was then nineteen years old. She then for the first time after September, 1914, became a member of the Ruf household in reality: she thereafter continued as such until she married—a period of two and a half years. During the last period of her residence with the Rufs she was not held out by them to the public, to their social set or even to their friends and neighbors *as a daughter*: at social functions she was introduced merely as Alpha Ruf Hatch. In the formal announcement of her marriage which she prepared herself, the announcement purported to be made by her mother and the latter's husband—the Rufs were not mentioned. After her marriage she wrote her aunt, expressing her gratitude for all that she and her "husband" had done for her, and took herself absolutely out of their lives.

The facts just rehearsed are the outstanding and controlling facts: they not only fail to establish the status of adopted child as alleged, they negative the existence of such status.

II. As a second postulate with which to buttress her case, appellant invokes the doctrine of equitable contract by representations. For a statement of it she quotes from Pomeroy as follows:

"There is, however, a form of contract peculiar to equity which is created by representations made by one party, and acts done by the other party upon the faith of such representations. . . . But in the equitable contract by representation, the one making the representation *may not intend to be bound*, may even intend to mislead. Equity thus infers a contract, although there may not be the mutual intention, the conscious, intentional meeting of both the minds, which is an essential element of

the legal conception of a contract." [3 Pomeroy, Eq. Jur. (4 Ed.) p. 3117, par. 1294.]

But in the same connection the learned author says: "The representation must be absolute in its terms and positive in its nature . . . .—otherwise the obligation, if any, which arises from it will be only moral or honorary." And again: "But in order that the right should be that of contract, the representation must be in some sense promissory—that is, must be something in the future. Representations of fact as existing or past may be the occasions of rights, but the rights will then be referable to fraud or to equitable estoppel, and not to contract." [Pomeroy, Eq. Jur., supra, par. 1294, note 1.]

On the theory of equitable contract the petition is insufficient; it does not declare upon contract. It merely alleges that plaintiff was "taken into their home . . . and was treated . . . and encouraged to believe, and given to understand, that she was taken into their home as a daughter; that . . . plaintiff assumed and performed . . . the duties and burdens and performed the services and gave the companionship and attention of a daughter;" it does not allege that any promissory representations were made or that plaintiff relied upon any such representations or altered her position in any way because of such reliance.

The proof is equally deficient. The representations which the evidence tends to show were made by Ruf to plaintiff were to the effect: you are my daughter; you are my heir; I have provided for you; if you marry, I will disinherit you. The only representation in any sense promissory was the one said to have been made when plaintiff expressed a desire to take a course of training as a nurse: "Well, you will never have to earn your own living because you will have everything I have." But even that statement indicated a present status: it was not a promise, "absolute in its terms and positive · in its nature," to be performed in the future.

The theory of recovery on equitable contract finds support in neither pleading nor proof.

III. There is a third theory, suggested in a preceding paragraph, and vaguely hinted at in the petition, which should perhaps be considered. This theory postulates: Ruf by his representations to plaintiff induced her to believe that she was his adopted daughter—his heir—and, being so induced, she gave him the affection, companionship and services of a daughter; wherefore, it would be a fraud upon her, if the representatives of his estate were permitted to now deny that she was in fact his adopted daughter. Under this theory of equitable estoppel the ultimate fact to be established is the status of adopted child, as was the case in Holloway v. Jones, supra; the burden of proving that fact is upon the plaintiff, "and it is necessary for her to establish it by

evidence so clear and convincing as to satisfy the mind of the chancellor beyond a reasonable doubt.''

The evidence does not satisfy us beyond a reasonable doubt that Ruf encouraged plaintiff to believe, and gave her to understand, that she had been taken into his home *as a daughter*. It is not suggested that such relationship, if assumed, was kept a secret between plaintiff and Ruf; and if not, why did not Mrs. Ruf and Edward Ruf and plaintiff's mother know something of it? Surely she would have confided it to her mother. When her mother was urging her to complete her education and by that means equip herself to earn her own livelihood, it would have been the natural thing for her to have said, ''Uncle Frank has adopted me and made me his heir; my duty is to him.'' But she said nothing of the kind, either then or at any other time. Her mother testified: ''She simply lived with them the same as Ned Ruf lived with them. She was simply a member of the family, and she was in the household. I never heard of any adoption.'' And it should be said that on this record the mother appears as a heroic figure, standing head and shoulders above the others of the *dramatis personae* in this lawsuit. Her answers to the questions propounded to her on the witness stand are so clear, crisp and concise, and so devoid of bias or partisan tinge, as to import all but absolute verity. It is inconceivable that plaintiff could have been imbued with the belief that she was the adopted child of the Rufs without disclosing it to her mother. That she had such a belief is belied by her own conduct: when real parental advice or guidance was needed, she sought her mother and not the Rufs. Her making her home with her Uncle and Aunt, under the circumstances of this case, was no evidence of adoption by them: it could well be that she preferred to be a petted favorite in a home of luxury and wealth rather than a toiler facing the struggles incident to making one's own way in the world. While in that home she contributed to the pleasure and happiness of its master, but she received from him an adequate return. We find no equity in the case.

The judgment of the circuit court is affirmed. All concur, except *Frank, J.*, not sitting.