MARTHA RICH ET AL., Plaintiff-Appellant, v. MAUDE BAER, Defendant-Appellant, No. 41853—238 S. W. (2d) 408.

Division One, March 12, 1951.

Motion for Rehearing or to Transfer to Banc Overruled, April 9, 1951.

*Kirby W. Patterson* for plaintiff-appellants.

1050

*Neale, Newman, Bradshaw, Freeman & Neale* and *Jean Paul Bradshaw* for defendant-appellant.

1052

[408] CONKLING, P. J.—On September 3, 1948, Oliver Wyatt, as plaintiff, filed suit in the Greene County circuit court against Maude Baer (defendant) to set aside a warranty deed which he had executed on April 23, 1948, conveying to defendant certain property in Springfield, Missouri, and reserving to himself a life estate therein. It was alleged the deed had been obtained by fraud and undue influence. In that action defendant counterclaimed [409] praying a decree that she was the equitable adopted daughter and sole heir of Oliver Wyatt. The deposition of Oliver Wyatt was taken November 20, 1948, and he died on January 2, 1949.

Thereafter the present plaintiffs, blood heirs of Oliver Wyatt, were substituted as parties plaintiff and filed their amended petition praying cancellation of Oliver Wyatt's above deed of April 23, 1948 on the grounds of fraud and undue influence. Defendant's answer to plaintiffs' amended petition denied certain material allegations and counterclaimed for equitable relief praying specific performance of an alleged oral contract of Oliver Wyatt with defendant to adopt her, and that she be decreed " the adoptive child and heir of Oliver W. Wyatt and Millie Wyatt". The latter was the wife of Oliver and had predeceased him. After the trial the chancellor's decree found

against the plaintiffs upon the prayer of their petition for cancellation of the deed and also found against defendant upon the prayer of her counterclaim for equitable adoption. Both plaintiffs and defendant have appealed from that decree. In reality two cases are involved: one for cancellation of the deed in question, and one upon the issue of equitable adoption. The two cases we consider separately. The facts as to each are involved, and the testimony took a wide range. Counsel were generously indulged in their search for hidden motives. The record is voluminous. Within the limits of this opinion it is impossible to even refer to all the testimony in the transcript now before us. But the transcript has been carefully studied. We consider the two cases de novo.

We first state the facts as to the purported equitable adoption. Defendant was born in the year 1900. In 1909, and for some time prior thereto Oliver W. and Millie Wyatt lived in Clinton, Missouri. They had no children. On March 4, 1909 (and perhaps about two weeks after defendant first came into the Wyatt home), acting under R. S. Mo. 1899, Sec. 5251, the County Court of Henry County, after the filing of statutory affidavits, after appearance of the parties and after hearing evidence upon the issue, entered an order finding that the parents of Maude Darden (now the defendant Maude Baer) ''are grossly immoral and are not suitable or capable of caring for * * * and should not have the custody of said child (Maude) and it is therefore ordered * * * that the custody and the control of the aforesaid child (Maude) be taken from the said parents, and the court further awards the custody, care and control of the aforesaid Maude Darden to Oliver Wyatt and Millie Wyatt * * * who reside in Clinton, Mo.'' Thereafter, until she was married the first time defendant lived in the Wyatt home. She was treated as their child, they loved her and she loved them, and she attended school and Sunday School. Defendant called Mr. Wyatt. ''Dad'' or ''Mr. Wyatt'', and spoke of Mrs. Wyatt as both ''Mother'' and ''Mrs. Wyatt''. In the school year of 1910-1911, and thereafter, her name appears on the public school records as Maude Wyatt. Publicly she went under the name of ''Maude Wyatt''. She performed assigned duties in the Wyatt home. Wyatt gave her spending money, and an allowance, and she saved a portion of it. The Wyatts said, on occasions, that they intended to adopt defendant. The Wyatts referred to her as ''our girl'' or ''our daughter''. The Wyatts supported her and clothed her. In 1915 the Wyatts moved to Springfield, Missouri.

In Springfield defendant enrolled in the ''Southwest Teachers College'' as Maude Wyatt, but never completed the course. She became a member of a church under that name. In 1918 under the name of ''Maude Loretta Wyatt'' she and one Howard Foster secured a marriage license, and were married in the Wyatt home.

Oliver Wyatt "gave her away." Howard and Maude Foster lived "rent free" in a house owned by Oliver Wyatt, who bought their furniture for them. Mr. Wyatt helped defendant's husband financially. The Fosters were later divorced and defendant returned to the Wyatt home to live. Defendant married a second time secretly and later went with her husband to live in Seattle. The second marriage (to one [410] Roger Moore) lasted three months, and Mrs. Wyatt went to Seattle and brought defendant back to the Wyatt home in Springfield to live. Defendant secured a divorce from Roger Moore. In 1922 defendant joined the Eastern Star, as the daughter of Oliver Wyatt, who was a member of the Masonic Order. About 18 months after defendant's divorce from Moore she ran away and was married to Mr. Baer, her present husband. They went to Butler, Missouri to live, but the Wyatts persuaded defendant and Mr. Baer to return to Springfield to make their home. They did so and lived "rent free" in a bungalow owned by Wyatt on Dollison Street. Later that bungalow was deeded to defendant by the Wyatts. Oliver Wyatt was good to defendant and to each of her husbands and did much to help each of them financially. Oliver Wyatt owned some filling stations. He put Mr. Baer into business with him in those stations, put money in the bank in the name of defendant and her husband, and purchased a truck for them. That business venture did not "work out". Baer became angry at Wyatt, checked out all the money in the joint accounts, left Wyatt the bills to pay and the Baers moved to Nevada, Missouri. Oliver Wyatt, and his wife, told some of the witnesses that defendant was "their adopted daughter."

Defendant testified that Oliver Wyatt told her several times "that he had adopted" her. Oliver Wyatt testified (and there is no proof to the contrary) that he never did formally adopt defendant, neither under the 1917 Act nor by executed deed of adoption; Wyatt testified "there wasn't nothing of that kind, just the County Court, to get her away from that (the Darden) home, it wasn't a very respectable home down where her step-father kept her"; Wyatt also testified that he never told defendant he had adopted her; that "I (Oliver Wyatt) went home and told her (defendant) she could stay here now and her step father couldn't force her to leave and that was about all that was said about it and we went along that way." "Q. Did you tell her to go under the name of Maude Wyatt when she went to school? A. There wasn't much said about it, we went along, and said as little about it as we could."

Defendant's counterclaim alleges that Mr. and Mrs. Wyatt took defendant into their home "for the avowed purpose of adopting her" and alleges that the Wyatts thereafter "agreed with the defendant and * * * stated to her and to the public generally that they would provide the care for, bring her up and treat her as their child, and that they would and subsequently did adopt her as their

child; * * * and (defendant) fully performed her part of said oral contract of adoption''; etc.

Defendant, in part, testified: ''Q. Let me go back now just one more question: When Mr. Wyatt told you about your adoption did he tell you he was going to adopt you or that he had adopted you? A. He came home one day and told me that I was his little girl, and that I was now his little girl and he said nobody could take me away from him, *and I always took for granted that he did adopt me.* * * * Q. Did he ever tell you that he was going to adopt you? A. When I first went there, yes, sir. * * * Q. How long after that was it that he told you that now you were his little girl and nobody could take you away from him? A. It wasn't so very long. Q. A week or two, I believe you said? A. Yes, sir. * * * Q. But after that he didn't tell you that he was going to adopt you, after you had this conversation about you being his little girl? A. He told me at different times I was adopted, I remember that. Q. Well, if he told you you were adopted he never told you he was going to adopt you, did he? A. I don't believe he did. * * * Q. Well, what did he tell you? Did he tell you he was going to adopt you or that he had adopted you? A. Well, he said he was going to adopt me and he told me later that he did adopt me. Q. And how much later? A. It wasn't very long. [411] Q. About a week or two, I understand? A. Yes, sir.''

It nowhere appears in this record that defendant was in fact formally adopted, either by deed, as required before the 1917 Act, or by order of the Juvenile Court, as required since 1917. But defendant contends, notwithstanding, that upon this record she is entitled to a decree of equitable adoption. She relies upon such cases as Rauch v. Metz, (Mo. Sup.) 212 S. W. 357, Drake v. Drake, 328 Mo. 966, 43 S. W. (2d) 556, Holloway v. Jones, (Mo. Sup.) 246 S. W. 587, Shelp v. Mercantile Trust Co., 322 Mo. 682, 15 S. W. (2d) 818, Menees v. Cowgill, 359 Mo. 697, 223 S. W. (2d) 412, Lynn v. Hockaday, 162 Mo. 111, 61 S. W. 885, and others. All have been carefully examined.

While defendant's counterclaim declares upon an oral contract to adopt, and upon the subsequent conduct of the Wyatts and defendant, and while in her counterclaim defendant prays ''that specific performance of said oral contract of adoption be ordered'', defendant does not here rely upon any such alleged oral contract. She pleaded also that the Wyatts, ''in equity and good conscience,'' became and are estopped from denying the equitable adoption of defendant. Defendant now mainly relies on an abbreviated and incomplete statement found in Shelp v. Mercantile Trust Co., supra, that, ''The doctrine (of equitable adoption) in brief is: Where one takes a child into his home as his own, thereby voluntarily assuming the status of parent, and by reason thereof obtains from the child the love, affection, companionship and services which ordinarily accrue

to a parent, he is thereafter estopped to assert that he did not adopt the child in the manner provided by law''. It is our view that the above quoted paragraph from the Shelp case does not state the entire and correct rule. We will later discuss our reason for that view.

But as to the proof of the oral contract declared on in the counter-claim it is the rule that, ''in order to establish an oral contract of adoption * * * the claimant child has the burden of producing evidence so clear, cogent and convincing as to leave no reasonable doubt in the chancellor's mind.'' Westlake v. Westlake, (Mo. Sup.) 201 S. W. (2d) 964, Benjamin v. Cronan, 338 Mo. 1177, 93 S. W. (2d) 975. The same burden of proof is upon one who asserts equitable adoption by estoppel. The chancellor found, as a fact, that, ''Oliver and Millie Wyatt never *agreed* to adopt the defendant and they did not adopt her''. In that finding we think the chancellor was correct. There was no evidence of a contract to adopt. Under this record the learned chancellor could not have found otherwise.

We have recently announced our adherence to the rule that ''equity may grant specific performance of a contract to adopt, or declare *in a proper case* that a defendant is estopped to deny the adoption agreed to be made.'' (Emphasis here ours) Menees v. Cowgill, supra. See also, Westlake v. Westlake, supra.

But without regard to whether these equitable adoption cases proceed upon a theory of the enforcement by equity of an oral contract to adopt; or whether such an adoption be considered as a status (in fact) voluntarily assumed, whereby, by certain beneficent conduct toward a child, one may obtain from the child ''the love, affection, companionship and services which ordinarily accrue to a parent'' it is certainly our view that the courts should decree equitable adoption only where justice, equity and good faith require it. Hollo-way v. Jones, supra. Equitable adoption is a principle and rule of equity only. If the above unequivocal paragraph quoted from the Shelp case be conceded by us to be the true and entire rule in these equitable adoption by estoppel cases, without the modification that the courts will enforce equitable adoption only ''where justice (equity) and good faith require it'' then the rule is but one of law. Then is the door opened wide to fraud. If the rule is so relaxed as to become one of law (instead of equity) childless couples will be more than ever reluctant to take into their homes orphan or other unfortunate children, [412] as is so often done, purely for the welfare of such children, and not for the purpose of adoption. See Benjamin v. Cronan, supra.

The fact that the alleged parents spoke to or of defendant as ''our girl'' or ''our daughter'', or that defendant was enrolled in school or known publicly as ''Maude Wyatt'', or that Wyatt told defendant he had (theretofore) adopted her while perhaps significant circumstances, are not determinative of the issue. Shelp v. Mercantile

Trust Co., supra, Westlake v. Westlake, supra, Benjamin v. Cronan, supra, Holland v. Martin, 355 Mo. 767, 198 S. W. (2d) 16. And the chancellor had a right to believe Oliver Wyatt's testimony that he did not tell defendant, or any one, that he either intended to or had adopted defendant. The chancellor likewise had a right under all the evidence to find and decree that equitable adoption by estoppel did not come into existence. And we rule that no fact or circumstance of record, nor all of them, are sufficient to support a decree of equitable adoption by estoppel.

The relationship of defendant with the Wyatts from shortly before March 4, 1909 until about August 1, 1948 (nearly forty years) was one of mutual respect and tender affection. Such affection was not unusual nor was it inconsistent with the order of the Henry County Court awarding the "custody, care and control" of defendant to the Wyatts, nor with the expressed purpose of the statute (Sec. 5251, supra) under which the custody order was made, i.e., for the purpose of "such moral training, care, education, and attention or (as) shall give such child an opportunity to grow up amid good surroundings and into useful citizenship". The situation of defendant in the Wyatt household and the esteem in which the Wyatts held defendant are entirely consistent with and in compliance with the order of the Henry County Court and follow the letter and spirit of the statute under which defendant's custody was awarded. The record shows that shortly prior to March 4, 1909, when she first came to the Wyatts, defendant was an undernourished, "little ragged girl", thinly clad in the cold February weather, and living in an environment from which any child would be quite grateful to escape. It is small wonder that she loved the Wyatts for her deliverance from the conditions which existed in the home of her step-father. It would be quite surprising if she had not. The Wyatts had no children, were attracted to defendant, she was a good girl and naturally they also loved her.

The record abundantly establishes that the relationship between the Wyatts and defendant and the situation in the Wyatts' otherwise childless home was one which brought great satisfaction to the Wyatts, both husband and wife. But, on the other hand, it is crystal clear that defendant profited immeasurably from the relationship and from her situation in the Wyatt home. She accumulated and had money and bonds, all of which came to her directly from the Wyatts. Through the years she had support, clothing and many luxuries so full of meaning to the heart of a growing girl. She received as much schooling as she would take. She had the advantages of affection from the heads of a Christian home, social position in the cities where the Wyatts lived and many other intangibles which made her life rich, full and gracious. The record facts reflect that defendant received "such moral training, care, education and attention * * * as

1058

(gave her) an opportunity to grow up amid good surroundings * * * into useful citizenship''. And she did so. The Wyatts continued to be generous with defendant during her three marriages. They gave her housing free of rent, and finally deeded a house to her. Wyatt helped each of her three husbands quite substantially in a financial and business way. The acts and attitude of the Wyatts in bringing into fruition this relationship so mutually helpful to all of them, in our opinion, were referable to and were but the carrying out of the order of the Henry County Court and the spirit and intent of the statute. The most favorable view of all of defendant's evidence ''is not necessarily consistent alone with adoption.'' Holland v. Martin, supra. The facts of [413] this case readily distinguish it from such cases as Rauch v. Metz, supra, Drake v. Drake, supra, Lynn v. Hockaday, supra, Holloway v. Jones, supra, McCary v. McCary, (Mo. Sup.) 239 S. W. 848, Remmers v. Remmers, (Mo. Sup.) 239 S. W. 509, Menees v. Cowgill, supra, Shelp v. Mercantile Trust Co., supra, and others cited and relied on by defendant. These facts do not present a situation where justice, equity and good faith compel a decree that defendant was equitably adopted. The trial chancellor correctly decreed that defendant ''is not the legally or equitably adopted child and heir of Oliver Wyatt and Millie G. Wyatt.''

We come now to consider the second case, the action by plaintiffs seeking to set aside the deed of Oliver Wyatt executed on April 23, 1948. This requires us to set out these facts in detail.

In 1944 Oliver and Millie Wyatt were living in Springfield, and defendant and her husband, Walter Baer, were living in Nevada, Missouri. In 1944 Oliver Wyatt suffered a paralytic stroke, and in 1945 he had another stroke. Thereafter he had difficulty in walking. In January, 1948 Mrs. Wyatt died. Oliver Wyatt was the sole beneficiary of her estate. When the deed in question was executed Oliver Wyatt was receiving $250 per month from her estate. In February, 1948, Oliver Wyatt fell and broke his hip. Defendant had nursed Mrs. Wyatt in her last illness. When Mr. Wyatt broke his hip defendant came to Springfield and helped to nurse him in a hospital. When in the hospital Wyatt suffered much pain and was upset emotionally. He returned to his home in the latter part of March, 1948. Defendant thereafter was one of his nurses at his home until sometime in June or July, 1948. The deed in question was executed April 23, 1948.

Wyatt loved defendant and showed her much affection. He placed much dependence upon her. She nursed him tenderly, affectionately and solicitously. In view of all that Wyatt had done for her, it surely was as little as defendant could do for him. Before the deed was executed (and possibly while he was still in the hospital) Mr. J. W. Chilton, president of the Farmers and Merchants Bank, of Springfield, drew a will for Wyatt, wherein he bequeathed most of

his estate to defendant. That will was later revoked by the execution of another will. Before the deed was executed Wyatt told defendant that she was all he had and that he wanted to convey to her the property in question. Wyatt said to defendant: "You are all I have got * * * I want you to go and call Mr. Chilton to come out here and draw this (deed) up". Defendant assented and, as Wyatt had requested, called Mr. J. W. Chilton to come to the house. When Chilton came he talked with both Wyatt and defendant, took memoranda, secured the description of the property in question from some. document in the house, suggested that Wyatt reserve to himself a life estate (to which Wyatt agreed), and returned to the bank where the deed was typed. Chilton then returned to the Wyatt home, read the deed to Wyatt who then signed it, took Wyatt's acknowledgment to the deed and returned to the bank and placed his seal on it. On April 23, 1948, Wyatt was confined to his bed in his home. Chilton asked Wyatt if he desired to show a consideration in the deed of one dollar and love and affection. Wyatt replied "Yes." As far as Chilton could tell Wyatt's mind "was perfectly all right." Wyatt's own testimony respecting the execution of the deed shows that .he understood the nature and consequence of his act and that he was perfectly rational. That fact is established by the great preponderance of all the testimony upon that question. As to the above, plaintiffs state their position in their brief in these words: "It is not contended and never was that he (Wyatt) was so mentally incompetent that he failed to know what he was doing." After the deed was executed Wyatt urged defendant to have the deed recorded. She had it recorded on May 13, 1948, and thereupon told Wyatt she had done so.

It is the theory of plaintiffs that Wyatt was unduly influenced by "the constant pressure exerted by defendant" to execute the deed; that defendant "nagged at him [414] constantly"; that the deed was "not the product of his free will and unhampered mind"; that Wyatt was 76 years old, had had two strokes, was ill in bed, and was "peculiarly susceptible to the importunities of others"; that the deed "was the result of a scheme * * * by defendant * * * for the purpose of defrauding him (Wyatt)"; that Wyatt executed the deed after receiving defendant's promise that defendant would not record it until after Wyatt's death; that defendant recorded the deed on May 13, 1948; that Wyatt later "charged defendant with having broken her promise and demanded that she (defendant) give him (Wyatt) a quit claim deed to the premises, which she refused to do."

The trial chancellor found as a fact from all the evidence that the execution of the deed "was his (Wyatt's) uninfluenced will and desire to convey the property to defendant and he (Wyatt) acted freely and voluntarily and without any undue influence having been exercised by defendant to cause him to sign the deed". The trial

chancellor concluded as a matter of law that the deed in question was executed "freely and voluntarily, not because of any undue influence exerted on him by defendant, and the deed in question was the product of his (Wyatt's) free and untrammeled will", and decreed the deed to be "valid and binding". It is our ruling that the chancellor correctly so decreed.

Further facts should be stated. The deed was executed in April, 1948. Defendant nursed Wyatt after his return home from the hospital, and continued to nurse him until midsummer of 1948. During all that time (and after the deed was executed) their relationship continued to be as deeply affectionate, as it had always been for more than forty years. In July or August, 1948 Wyatt conceived the idea of making a new will and therein making a certain young lady the sole beneficiary of his estate. This young lady was engaged in religious work in Springfield, and, with certain boys and girls, had held religious services at Wyatt's bedside. That young lady worked in Mr. Chilton's bank. Wyatt discussed with Chilton his plan for the new will.

About August 1, 1948, Wyatt said to defendant: "Maude, I want you to give me back that deed, as I want to get married and I want Miss Hawkins to have everything". Defendant declined to give back the deed or to make a new deed conveying the property back to Wyatt. He thereupon ordered her out of the house. Wyatt was never even angry with defendant before that time. On September 3, 1948, the instant suit was filed. When Wyatt's deposition was taken November 20, 1948, he testified that prior to the execution of the deed in question defendant for a month "kept nagging at me" to execute the deed in question; that when he did so it was with the understanding that defendant would not record it during Wyatt's lifetime; that when he found out she had recorded the deed, he told defendant that she had lied to him and ordered her out of the house.

Except for Wyatt and a doctor, both of whom testified by deposition, these witnesses were before the trial chancellor who had a right upon all the evidence to find as he did that the deed was not executed because of undue influence.

Plaintiffs contend that between Wyatt and defendant there was a confidential and fiduciary relationship; that Wyatt was weak mentally and particularly susceptible to undue influence by defendant; that defendant "nagged" Wyatt into executing the deed; and that under Morris v. Morris, 4 S. W. (2d) 459 and Shafer v. Hatfield, 359 Mo. 673, 223 S. W. (2d) 396, the execution of the deed carried a presumption of invalidity, and it is incumbent on defendant "to show affirmatively that no deception was practiced or undue influence used and that everything was fair, open, voluntary and well understood."

It is clear from the brief of plaintiffs that they have confused "confidential and fiduciary relationship" with the natural love and

affection which had always and then did exist between Wyatt and defendant. It is true that the record clearly reflects that Wyatt reposed confidence in defendant. [415] He also had deep affection for her. But this does not give rise to a presumption of undue influence as a matter of law. Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772. "There must be evidence of a special trust with respect to property or business." Shaw v. Butler, (Mo. Sup.) 78 S. W. (2d) 420, 428. "The relation of confidence which ordinarily exists between mother and son, without more, would not be sufficient to raise a presumption of undue influence. There must in addition be substantial evidence showing especial trust in the management by the son of the mother's business matters, or unusual influence and control arising from the son's personal care and charge of the mother". Hershey v. Horton, 322 Mo. 484, 15 S. W. (2d) 801, 807, Clark v. Leonard, (Mo. Sup.) 232 S. W. (2d) 474, 478. See also, Jensen v. Phippen, 225 Iowa 302, 280 N. W. 528, Koppal v. Soules, 56 Atl. (2d) 48, 50, Shaffer v. Shaffer, 23 Atl. (2d) 883, 885. No evidence appears here of any special trust with respect to property or business, or of any unusual influence or control arising from defendant's care of Wyatt. Even though the existing situation between Wyatt and defendant (due to their long personal attachment and their existing affection) was not an "arms-length" one, the chancellor was justified under the evidence in finding there was no "over-reaching", and that the deed was not executed because of defendant's "nagging", or any undue influence.

Plaintiffs' contention seems based upon their argument that because Wyatt loved defendant and defendant was in the Wyatt home helping to nurse him, and that, because there was opportuntiy thereby afforded for defendant to have exercised undue influence, and because plaintiffs suspect and charge that she did so, that we should hold that she did so. Upon such premise we cannot so hold.

Undue influence in the execution of a deed may be shown by or inferred from acts or circumstances in evidence but cannot be inferred from mere opportunity to unduly influence or from mere suspicion that defendant did so. "Mere natural influence of attachment or love or even the desire to gratify the wish of a loved one is not undue influence and is not banned by the law." McCoy v. McCoy, 360 Mo. 199, 227 S. W. (2d) 698, 706. And the fact that defendant, at the request of Wyatt, summoned the scrivener, Mr. Chilton, to draw and prepare the deed for Wyatt's signature and acknowledgment (without more) is not such participation in its execution as will invalidate the deed. McCoy v. McCoy, supra. We find in this record no facts and no legitimate inference which gives rise to a presumption of invalidity of this deed. This case is readily distinguishable on facts from Morris v. Morris, supra, and Shafer v. Hatfield, supra.

1062

In support of the trial chancellor's conclusion that defendant exercised no undue influence and that the execution of the deed was the "free and untrammeled will" of Wyatt, the testimony of defendant was supported by that of the nurses in the household. From the circumstance that the deed was executed in April and that it was not until August that Wyatt changed his mind, and ordered defendant whom he had loved for nearly forty years to forever depart from his home, and upon the testimony of the nurse Tina Lawson, the chancellor could have resolved the issue of whether defendant "nagged" Wyatt into the execution of the deed in favor of defendant. At least the chancellor could find either way. The record evidence does not satisfy us that defendant exercised undue influence in the execution of the deed or was guilty of fraud and we do not see how the chancellor could have reached a contrary conclusion. We find that no fraud or deception was practiced, that no undue influence was used and that, moreover, the transaction of the execution of the deed was fair, open, voluntary, well understood, and was the free act and deed of Mr. Wyatt.

In view of our conclusions as above stated, and in deference to the decree of the trial chancellor who saw most of the witnesses and heard them testify, the decree entered in the circuit court, and from which all the parties appealed, must be and is affirmed. It is so ordered. All concur.