Nannie Mitchell TURNER, Individually and as Successor Trustee Under the St. Louis Argus Trust Agreement, and Frank Mitchell, Senior, Individually and as Remainderman Under the St. Louis Argus Trust Agreement, Respondents,

v.

Edwina MITCHELL, Individually and as Successor Trustee Under the St. Louis Argus Trust Agreement,

J. Orvel Mitchell, Individually and as Remainderman Under the St. Louis Argus Trust Agreement,

Emanuel C. Wright, Loretta E. Owens, Carl Flipper, Junior, and St. Louis Argus Publishing Company, a Corporation, Appellants.

No. 45233.

Supreme Court of Missouri,

Division No. 1.

Dec. 10, 1956.

Rehearing Denied Jan. 14, 1957.

Robert M. Zeppenfeld, R. L. Witherspoon, St. Louis, for appellants.

David M. Grant, Earl Susman, Herman Willer, Warren H. Kawin, Gerald A. Rim-

mel, Susman, Mayer & Willer, St. Louis, for respondents.

**HYDE, Judge.**

■ Action to declare rights in respect to administration and construction of a trust involving stock of St. Louis Argus Publishing Company, for removal of a cotrustee, and to declare void a shareholders' meeting of Argus (April 30, 1954) and the acts of defendants as directors and officers of Argus purported to be elected at that meeting and enjoining defendants from act-ing as such. The trial court declared the trust valid, removed the cotrustee, appointed a successor cotrustee, declared the shareholders' meeting unlawful and invalid and enjoined defendants from any action connected with Argus based on that shareholders' meeting. Defendants have appealed from this decree. We have jurisdiction because of the amount involved, the 740 shares of stock, held by the trust, having a value of twenty dollars per share and dividends of $12,580.00 being in dispute.

■ Plaintiffs have filed a motion to dismiss for violation of 42 V.A.M.S. Supreme Court Rules, Rule 1.08 because of defendants' failure to make in their brief "a fair and concise statement of facts without argument"; failure to have a proper statement of points relied on showing "what actions or rulings of the court are sought to be reviewed" and "wherein and why" any actions or rulings of the trial court are claimed to be erroneous; and failure to make any specific page references to the transcript in the argument and insufficient references in the statement of facts. Defendants' brief, as appellants, is defective in these respects. It is surprising that so many lawyers fail to comply with the requirements of Rule 1.08 as to "points relied on" especially after our full explanation of its requirements in Ambrose v. M. F. A. Cooperative Ass'n, Mo.Sup., 266 S.W.2d 647 and our careful rewriting of the rule after that decision to state in detail its requirements. Obviously this Court must know, before it can properly consider a case, just what the trial court did that the appellant claims to be wrong and why he contends that it was wrong. (We should think that an appellant's lawyer would want to make that clear to the Court first of all.) The best way to do so is to so state in the points relied on; and that is the reason for these requirements of Rule 1.08, which if properly complied with would give the Court a short concise outline of the errors claimed and the contentions to be made concerning them in appellant's argument.

However, since this is an equity case and defendants now say the only question on this appeal is whether or not there is a valid trust, we will consider that question because we find, in the points set out in the part of their brief called "Conclusion", that they do finally state their contention that the trust was void. We will, therefore, consider the points stated in the "Conclusion" as stating one single claimed erroneous ruling appealed from and taken in connection with the abstract statements set out under "Points and Authorities" as giving the reasons why defendants contend it was error to declare the trust valid. Upon the authority of Rules 1.15 and 1.28, other defects will be overlooked in the interest of deciding that issue on the merits. Therefore, the motion to dismiss is overruled.

The trust agreement was dated January 11, 1945 and was signed as settlors by Joseph E. Mitchell, who died December 17, 1952 and William Mitchell, who died March 10, 1945. The settlors were brothers who had founded the St. Louis Argus in 1912 as a weekly newspaper mainly to serve the negro population in the St. Louis area. The business was incorporated in 1916 as the St. Louis Argus Publishing Company and the trust agreement stated Joseph E. Mitchell owned 550 shares and William Mitchell owned 190 shares. This stock represented the controlling interest, only 34 shares being owned by others. The trust agreement stated that it was made "for the purpose of creating a trust estate and providing for its management and control and for distri-

bution of the trust property" under the name "St. Louis Argus Trust Estate", with the settlors as the first trustees. (Article I.) It was provided (Article IV) that in the event of the death of either settlor he should be succeeded as trustee by his wife and William Mitchell was succeeded by plaintiff Nannie Mitchell Turner (remarried after the death of William Mitchell) in 1945. The first actual transfer of the stock certificates on the books of the corporation was made January 24, 1946 by issuing a new certificate for 740 shares to Joseph E. Mitchell and Nannie Mitchell, Trustees of St. Louis Argus Trust Estate. Defendant Edwina Mitchell succeeded Joseph E. Mitchell, when he died in 1952, and thereafter on March 26, 1954, a new trust certificate for 740 shares was issued to Nannie Mitchell Turner and Edwina W. Mitchell, Trustees of St. Louis Argus Trust Estate. The trust agreement (Article IV) further provided if Edwina Mitchell died she should be succeeded as trustee by Orvel Mitchell, son of Joseph E. Mitchell by a former marriage; and, if Nannie Mitchell died, she should be succeeded by Frank Mitchell, who was the son of William and Nannie Mitchell. Dividends on the stock less expenses of the trust estate were to be paid one-half each, to the original trustees or to their successor trustees. Article IV also provided for appointment of trustees by the Circuit Court of the City of St. Louis in case of incapacity of any of the designated successor trustees.

Article II made the duration of the trust 21 years; and also made the wives of the settlors beneficiaries with life estates, commencing at the end of 21 years. The remainder in the one-half of the stock in which Nannie Mitchell had a life estate was in Frank Mitchell and the remainder in the one-half of the stock in which Edwina Mitchell had a life estate was in Orvel Mitchell. Article III stated: "All right, title and interest of the said Joseph E. Mitchell and the said William Mitchell in and to the aforesaid shares of stock now owned by each of them is hereby transferred and conveyed to the trustees hereinabove named

absolutely, and to their successors, etc." Article III further provided that the trustees were to manage, control and vote the stock and to act as directors of the corporation. Article III stated the purpose "to provide for the continued publication business of said corporation and of said newspaper for a period of twenty-one years" during which period they could not vote to dissolve the corporation or to discontinue the publication of the newspaper. (This could only be done under Article VI by unanimous action of the trustees and of all beneficiaries.) Other provisions of the trust agreement will be stated in considering defendants' contentions.

In the operation of the business up to 1945, William Mitchell mainly handled the mechanical operations of printing and publishing, including the distribution of the newspaper and making collections, while Joseph Mitchell handled composition, editorials, advertising and general front office business. After 1941 William also helped in the office because of Joseph's illness which began in 1939; William and Joseph both drew the same salary. Apparently William died suddenly and unexpectedly and was active almost to the time of his death. William's wife Nannie had worked in the business continuously since it began (mainly in the office but at first even running the job press) and their son Frank had been doing much the same kind of work in the business as his father (beginning in 1917 at the age of 12 as printer's devil) except for about four years (before 1943) with the Chicago Defender to get instructions there. After William's death, Frank took over his work. Orvel Mitchell, Joseph's son, also began to work in the business at an early age, but left in 1939, returning to the paper in 1946 when he was discharged from the army. He worked about two years, 1946–1948, but then left after a disagreement with his father and was in Chicago for four years prior to his father's death. Orvel's mother died in 1938 and Joseph married Edwina in 1940. After William died, Joseph Mitchell and Nannie Mitchell did act as

trustees and operated the business as such, receiving dividends from the trust for the years 1946 to 1951 inclusive, amounting to a total of $6,290.00 each. Joseph Mitchell was ill most of the time after 1944, going twice to the Mayo Clinic for treatment, and, during the last four years of his life, much of his former work was done by Nannie Mitchell and her grandson, Frank Jr. During the year preceding his death, Joseph Mitchell was unable to come to the office and Frank Sr. would go to his home several times each week to discuss the business with him, going over the paper, reports and bank statements. Nannie Mitchell also would go to his home to consult with him. Frank Sr. testified that, before the death of Joseph Mitchell, operations were on a harmonious basis and the paper was being published with the utmost efficiency.

After Joseph died, Edwina came to the office with two lawyers, demanded all records and subsequently went over them. The lawyers also made a written demand that stock certificates issued to the trust be reissued to show Edwina as cotrustee. (This was done on March 26, 1954.) After considerable controversy, on March 16, 1953, just before the annual shareholders' meeting an agreement was signed between Edwina, Orvel, Nannie and Frank, providing that they should be elected directors (the corporate articles providing for four directors); that Nannie should be President, Edwina, Chairman of the Board and Treasurer, Orvel, Vice-President, and Frank, Secretary; that Nannie and Edwina should each receive the same compensation and Orvel and Frank should each receive the same compensation; and that all money should be disbursed by checks signed by the President and Treasurer. However, after this agreement was carried out at the 1953 shareholders' meeting, the parties subsequently disagreed about many matters, including employees' duties and compensation, policy of the paper, editorials and news articles to be published, purchase of equipment and disposition of funds. At the an-

nual meeting of March 1954, Edwina and Nannie (as trustees) could not agree on voting the trust stock and the meeting was adjourned until April 30, 1954. At that meeting, Edwina took the position that the trust was invalid and that the meeting would continue without adherence to the trust; and that she and Orvel, as executrix and executor of the estate of Joseph Mitchell, would vote the 550 shares originally owned by him, which would give them a majority of the issued stock. Nannie and Frank refused to participate on that basis and withdrew. Proceeding and voting on that basis, however, new by-laws were adopted providing for seven directors who were then elected. After an attempted meeting of these new directors, on May 8, 1954, at which the parties hereto were represented by their lawyers, this suit was commenced and a temporary restraining order obtained enjoining defendants from acting under authority of the April 1954 shareholders' meeting or making any new or unusual expenditures except by unanimous consent of the four directors elected in 1953. Other facts will be stated in discussing defendants' contentions.

Defendants make several contentions on which they base their claim of invalidity of the trust. First they say the trust agreement did not create a trust but was only a proposal as to terms to be contained in a final document which would create a trust. They further argue the trust res (the stock certificates) was not transferred to the trustees, saying the certificate of William Mitchell was never endorsed by him and, therefore, has not yet been transferred. Next they say the agreement was a nullity because they claim it was not signed by both settlors during the life of both, claiming that Joseph Mitchell signed after William Mitchell died. In this connection, they also claim that material alterations were made in the trust agreement and say that it should not be accepted and enforced for that reason. They also say that the attempted transfer of the stock certificates in January 1946 was invalid because not made

to the trustees or to any legal entity but to the "St. Louis Argus Trust Estate" which was a name only and not an entity capable of holding title. Finally they say there could be no valid trust because the settlors were both trustees and beneficiaries.

■ Considering these contentions in the above order, we find the first is wholly without merit. Defendants say "the tense of the verbs indicates that it is not an agreement in final form", arguing that the words "its first trustees *shall* be, etc." instead of "are" looks to the future instead of the present; and that the words "the trustees *shall* hold title, etc." indicates that the trustees "are to have title vested in them upon the execution of a final trust agreement to be prepared and executed". We see no reason why these provisions should not be construed as meaning that the trust was created and the title vested upon the execution of this trust agreement as specifically stated in Article V hereinafter set out. Defendants cite no authority for their unusual construction and we know of none. (Defendants also overlook the provision of Article III hereinabove quoted that "all right, title and interest" of the settlors in the stock "is hereby transferred and conveyed to the trustees, etc.") Defendants' further argument, that preparing the agreement with blank spaces for the date and amount of stock owned by each settlor indicates it was not to be the final instrument, is certainly illogical, unreasonable and opposed to common experience.

Defendants' first contention above discussed and also their contention that the trust res was not transferred to the trustees, because William Mitchell died without endorsing his stock certificate for transfer, is completely refuted by Article V of the trust agreement which is as follows: "It is the intention of the settlors herein to transfer and convey absolutely their several rights, title and interests in and to the shares of stock transferred and conveyed hereunder to the trustees herein for the uses and purposes aforesaid, and that the same shall vest in said trustees upon the signing of this agreement and that the ownership thereof by the settlors herein shall cease upon the signing of the same, and that all the respective rights and interests of the settlors therein shall vest in said trustees, and their successors, except the right of said settlors to receive and enjoy the dividends and income from said shares of stock when paid by said corporation to the trustees. In case said settlors, or either of them, shall fail, or shall be prevented in any manner from causing said stock to be transferred to said trustees on the books of said corporation, then this agreement shall be considered authority for the transfer of said shares of stock on the books of said corporation to said trustees by the proper officers of said corporation, and said trustees, either or both of them, or their successors, are hereby authorized as agents of the settlors to cause said shares of stock to be so transferred on the books of the corporation."

In Potter v. Winter, Mo.Sup., 280 S.W.2d 27, 33, we said concerning a provision (less specific than the one herein involved): "In order to create a valid express trust inter vivos there must be a beneficiary, a trustee, a trust res so sufficiently described or capable of identification that the title thereto can pass to the trustee, and an actual delivery of the trust corpus, its character considered or a legal assignment of the same to the trustee actually conveying present title to the trustee; or retention of the corpus by the owner under circumstances which unequivocally discloses an intent to hold it for the use of another. Atlantic Nat. Bank of Jacksonville, Fla. v. St. Louis Union Trust Co., 357 Mo. 770, 211 S.W.2d 2, and authorities therein cited. In the instant case the language of the indenture itself purports to be a present transfer of the properties listed in the Exhibits attached. The properties listed were recited to have been, and were thereby 'assigned, transferred and delivered' to the named trustees, Charles Edward Potter and M. E. Turner. It was not fatal to the validity of

the indenture, considered as an instrument creating a trust inter vivos, for the grantor to reserve in himself a beneficial life interest."

The case of Atlantic National Bank v. St. Louis Union Trust Co., 357 Mo. 770, 211 S.W.2d 2, relied on by defendants is not in point because the settlor there attempted to create a trust in third parties to whom no trust property was transferred or delivered during the settlor's lifetime and the instrument plainly provided that title would not go to the trustees until after his death and until then would be retained by him. The provisions of the trust instrument herein are exactly opposite as shown by Article V, supra. Nor are the cases of inter vivos gifts, cited by defendants, in point. The distinction is thus stated in Scott on Trusts, Sec. 28: "A declaration of trust is therefore the simplest method by which one can give to another an interest in property. If the property is not an interest in land, and if the disposition is not testamentary in character, no formalities are required for a declaration of trust. All that is necessary is that the owner of the property should manifest an intention to hold the property in trust. In the case of a gift of property, delivery or a deed of gift is necessary. In the case of a contract, consideration or a deed is required. But in the case of a declaration of trust neither consideration nor deed is necessary."

 This is a case of a declaration of trust in property by the owners of the property. See Restatement of Trusts, Secs. 17, 18, 23 and 24; Scott on Trusts, 17, 18, 23 and 24; Harris Banking Co. v. Miller, 190 Mo. 640, 89 S.W. 629, 1 L.R.A.,N.S., 790; Rollestone v. National Bank of Commerce, 299 Mo. 57, 252 S.W. 394. By this instrument, each settlor declared himself trustee of the stock he owned as well as providing that the other was also trustee thereof. It is stated in Restatement of Trusts, Sec. 17, comment a: "If the owner of property declares himself trustee of the property, a trust may be created without a transfer of title to the property." See also Scott on Trusts, Sec. 17.1. This is because the legal title is in him both before and after the declaration although he holds it for a different purpose. Thus as to his own stock, William Mitchell certainly held the title in trust after he signed the trust agreement. Bogert on Trusts, Sec. 142(b) says: "The owner of shares of stock in a corporation may make himself trustee of them for another by oral or written declaration of the trust without delivery of any document to the cestui or change of the corporation records." The same authority also states that the mere delivery of the stock certificate unendorsed, to hold in trust, passes at least equitable ownership. See also Bakewell v. Clemens, 354 Mo. 686, 190 S.W.2d 912. Furthermore, when there are two trustees, they hold as joint tenants so that the title vests in the other even if one dies before the conveyance becomes effective. Restatement of Trusts, Sec. 34; Scott on Trusts, Sec. 34. Moreover, our statute, Section 403.050(2), references are to RSMo 1949, V.A.M.S., authorizes transfer of shares "by delivery of the certificate and a separate document containing a written assignment of the certificate." We can see no reason why the trust agreement with the provisions of Article V thereof should not be considered such a document. See also Sections 403.090, 403.110, 403.130 and 403.-140. We, therefore, overrule defendants' contentions concerning vesting of title to the stock certificates and hold that under these circumstances the execution of the trust agreement at least was sufficient to vest equitable title to the shares of the corporation in the two trustees and to authorize transfer and issuance of new certificates thereafter.

 Defendants' contentions concerning alteration of the trust agreement and the time it was signed by Joseph Mitchell require further statement of facts. George Vaughn, the attorney who prepared it, died in September 1949. Defendants had the evidence of an expert witness, an examiner of questioned documents, to the effect that

the first three pages of the trust agreement (consisting of six pages) were written at a different time and with a different typewriter ribbon than the last three pages, although apparently on the same typewriter. (The first three pages contained Articles I and II and most of III.) The witness also pointed out that there was a difference in the width of the margin on the first three pages from the margin on the last three pages; that there were more staple holes in the last three pages than in the first three; and that there was a slight difference in the width of the pages. Orvel testified that, when he got out of the army in January 1946, Nannie whispered to him in the office that they had to change the trust because it gave Edwina too much advantage. This was denied by Nannie who said she saw the trust agreement in December 1944 and that she had been hearing about it all through that year. There is no evidence that Joseph Mitchell ever claimed there was any change in the trust agreement after it was executed, although at all times he had in his possession a carbon copy which also had been signd by both settlors and which was in evidence at the trial. Joseph Mitchell assigned his stock in accordance with the trust agreement and worked under it as cotrustee with Nannie for more than six years after William's death. Certainly there was a reasonable basis for the Court to find there was no alteration of the trust agreement after it was executed.

Orvel also testified that he saw his father sign the trust agreement on January 24, 1946, the day the stock certificates were transferred to Joseph and Nannie as cotrustees. Nannie testified that she saw both Joseph and William sign the trust agreement on January 11, 1945, the date it bears. George Vaughn, the lawyer who prepared it, was present on both occasions but died before Joseph; his handwriting appears both on the trust agreement and the transferred certificates. As to the conflict of oral testimony on this matter as well as on the alteration of the trust agreement, we think we should defer to the finding of the trial court. See Section 510.310. While we are not bound by the trial court's findings and have the authority as well as the duty to consider the evidence and make our own findings, we will not set aside the judgment unless we find it to be clearly erroneous and will give due regard to the better opportunity of the trial judge to pass on the credibility of witnesses who orally testified before him. In this case, the oral testimony that the trust agreement was signed by Joseph on January 24, 1946 is uncorroborated, while the oral testimony that the trust agreement was signed on January 11, 1945 is corroborated not only by the date appearing on the original and the copy of the trust agreement but also by the will of Joseph Mitchell, executed September 17, 1946, which contains a provision concerning the trust, referring to it as "the St. Louis Argus Trust, created January 11, 1945", and the testimony of the lawyer who wrote the will that he got this information from Joseph Mitchell by word of mouth. It is also corroborated by the allegation of a petition, in a suit to cancel the trust, brought by Joseph Mitchell in the Circuit Court of the City of St. Louis in December 1949, that he executed the trust agreement on January 11, 1945. It also appears in evidence, as a reason why Joseph would make a trust agreement giving William an equal interest with him in the stock of the corporation, that in May 1939 (the year Joseph first became ill) Joseph had assigned to William his 550 shares of stock in the corporation by a document stating that "certain deals and transactions have taken place between the parties hereto wherein certain moneys have been expended, including money advanced by said William Mitchell"; and that "it is the intention of the parties hereto that the said William Mitchell shall, in the event of the death or incapacity of said J. E. Mitchell, have the management and control of said company." It further appears that in October 1944, Joseph received a check of $4,000 on the account of the St. Louis Argus Publishing Company

signed by William Mitchell. Considering all the evidence in this case, we accept as correct the views of the trial court and hold that defendants' contention of invalidity of the trust, on the grounds of alteration or that it was not signed by Joseph prior to the death of William, cannot be sustained.

■ Little comment is required as to defendants' contention of invalidity on the ground that the original stock certificates (of Joseph and William) were assigned for transfer to "St. Louis Argus Trust Estate", which was not a legal entity. In the first place, we have held that Article V of the trust agreement was sufficient alone without any execution of the transfer form on the back of the certificates, to authorize transfer to the trustees. Furthermore, the transfer was made to the trustees and that would have been authorized by the statute, Section 403.050(1) by an endorsement in blank.

■ Likewise, defendants' contention that the trust was invalid, on the ground that the settlors were both the trustees and beneficiaries cannot be sustained. Defendants cite Restatement of Trusts, Secs. 99 and 115. While Sec. 99(5) says "the sole beneficiary of a trust cannot be the sole trustee of the trust", in the same Sec. 99(4) it is stated: "If there are several beneficiaries of a trust, the beneficiaries may be the trustees." Comment (b) under Sec. 99 states: "There can be a trust where there are several beneficiaries who are also the trustees. In such a case each of the beneficiaries has an equitable interest which is separate from the legal interest held by the whole group. As trustees they hold the legal title as joint tenants, and ordinarily they hold the beneficial interests as tenants in common. No one of them, without the concurrence of the others, can properly transfer an undivided legal interest in the property free of trust. If a creditor of one of the beneficiaries seeks to reach his interest he can do so only by proceedings appropriate for reaching an equitable interest, and cannot levy execution in an action at law upon his legal interest." Likewise, Sec. 115(4) states: "If there are several trustees of a trust, the trustees may be the beneficiaries of the trust." The illustration to subsection 4 is as follows: "A transfers property to B and C in trust for B and C. A trust is created." The interests of the trustees and beneficiaries are different both as to quantity and quality of title. Horlick v. Sidley, 241 Wis. 81, 3 N.W.2d 710, 717; see also Jones v. Shrigley, 150 Neb. 137, 33 N.W.2d 510, 515. As shown in Scott on Trusts, Sec. 99.5, there are some cases contra but they do not represent the better or modern majority view. See recent cases cited 1 Scott on Trusts 745; see also Annotation 151 A.L.R. 1287; Bogert, Trusts and Trustees, Sec. 129; Restatement of Trusts, Sec. 341, comment h; 54 Am.Jur. 101, Sec. 117; 90 C.J.S., Trusts, § 210, p. 139. Furthermore, in this case, the interests of the original trustees (the settlors) were to cease at the end of the 21 year period, at which time the wife of each, if living, was to take a life estate in one-half of the stock, which was finally to go equally to the son of each settlor, or the sons' respective heirs absolutely. Thus it is apparent that the original trustees did not have the entire beneficial interest. See Fry v. McCormick, 170 Kan. 741, 228 P.2d 727, 729. Upon consideration of all of defendants' contentions, we hold the trust valid; and, since all claims made by defendants were based on invalidity of the trust, it is unnecessary to discuss them further.

The judgment is affirmed.

All concur.