Madeline Gerber HEGGER, Appellant,

v.

Albert KAUSLER, as an Individual, and Albert Kausler, as Executor of the Estate of Mary Manwaring, Deceased, Respondent.

No. 45521.

Supreme Court of Missouri,
Division No. 1.

June 10, 1957.

Granville L. Gamblin, Hugo L. Weismantel, St. Louis, for appellant.

Douglas H. Jones and Charles A. Lee, Jr., St. Louis, for respondents.

HOLLINGSWORTH, Presiding Judge.

This is an action in equity wherein plaintiff, Madeline Gerber Hegger, seeks a decree declaring her to be the "equitably adopted daughter" and sole heir of Mary L. (Kausler) Manwaring, deceased, and, as such, by virtue of pretermission from the last will and testament of deceased, to take the property, real and personal, of which the latter died seized. The defendant is Albert Kausler, a brother of deceased, who is sued both in his individual capacity as the sole legatee and devisee of all of the property of deceased and as executor of her estate. The petition alleged that when plaintiff was four years of age her natural mother committed her "to the custody of the deceased, Mary Manwaring," and that deceased and her husband, Hart Manwaring, who predeceased his wife, took plaintiff into their home with the "intention at that time to take plaintiff * * * as their own child and * * * to legally adopt her"; that thenceforth a parent and child relationship existed between the Manwarings and plaintiff with

full performance on the part of each, except that the Manwarings negligently failed to perfect plaintiff's lawful adoption; and that, in equity and good conscience, Mary Manwaring was and defendant, who claims under her, is estopped to deny such adoption. The trial court found that the evidence was "not sufficiently clear and convincing to create an adoption by estoppel", and dismissed plaintiff's petition.

Plaintiff's primary contention is that the court erred in holding the evidence not sufficiently clear and convincing to warrant the relief sought. She also urges error in the refusal of the court to allow her to testify in her own behalf, contending that her incompetency as a witness was waived by cross-examination of her in a prior suit to contest the will here involved. Defendant, Albert Kausler, contends that there was no credible evidence upon which to base an estoppel to deny adoption; that plaintiff's claim is stale and is barred by laches and by the several statutes of limitations; that a judgment of dismissal of a petition of plaintiff to intervene as the equitably adopted daughter of deceased in the earlier suit brought by certain of the collateral heirs of deceased to contest the will of the latter, from which plaintiff never appealed, is res adjudicata of the cause of action here pleaded; and that there was never any waiver of plaintiff's incompetency to testify in her own behalf in this action.

Mary Manwaring, a widow without descendants, died a resident of the City of St. Louis on July 30, 1951. Her last will and testament, executed on April 27, 1951, was duly admitted to probate in the City of St. Louis. The first item provides for payment of debts. The remainder of the will, copied verbatim except as to signature and attestation, reads:

"Second: To the following relatives being the nearest of kin, being George Kausler Charley Kausler, and heirs or children of my late brother Henry Kausler, all being named being brothers of mine I give nothing as they have already received what I wished them to have during my lifetime.

"Third: To my half brother Irwin Kausler and his sister being my half sister Erma Kausler I leave nothing as they too have received what I wish them to have from my estate while I lived.

"Fourth: To my sister Dora (Kausler) Huey I leave nothing as she has received what I wished her have from me while I lived.

"Fifth: To my brother Albert Kausler I give and bequeath whatever I have left after the above mentioned expenses are paid, all my estate remaining both real and personal or either whichever it may be or both if so existing, as he has been very attentive and good to me during my life.

"Sixth: I ask that the honorable court appoint Albert Kausler to be the Executor of my estate without bond and to take care of all of the estate as above shown.

"Seventh: This being my desire and wish I furthermore say nothing."

The estate consisted of personalty of the inventoried value of $4,182.20 and realty, a two-story "flat" in the City of St. Louis, of the inventoried value of $12,000. The personal property, aside from household goods, consisted of seven $500 U. S. Series "G" Bonds issued to Mary L. Manwaring, five of which were issued in April, 1943, one in October, 1944, and one in October, 1945, and a checking account in the sum of $489.70.

The uncontroverted facts, stated generally without regard to the party by whom developed, are:

Plaintiff, often referred to in the record as Madeline, was about 44 years old when this case was tried in 1955. She was one

of three children of Willis and Maude Gerber. Maude Gerber was a sister of Hart Manwaring, the husband of Mary Manwaring. Plaintiff is therefore, a blood niece of Hart Manwaring and a niece of Mary Manwaring only by virtue of the latter's marriage to Hart Manwaring.

Plaintiff's father, Willis Gerber, was fatally injured in an accident when she was one year of age. Thereafter, her mother became afflicted with tuberculosis and, when plaintiff was about four years of age, her mother entered Koch Hospital. Plaintiff's sister, Philettie, and brother, Hart, were placed in the care of their father's (Gerber) family and plaintiff was taken into the home of Mr. and Mrs. Manwaring. Plaintiff's mother died of tuberculosis about four years thereafter, when plaintiff was eight years of age.

Plaintiff made her home with the Manwarings from the age of four (about 1915) until Hart Manwaring's death in 1943 and thereafter with Mrs. Manwaring until shortly prior to plaintiff's marriage to John Hegger in January, 1944. From the time plaintiff entered the Manwaring home she retained and went under her true name of Madeline Gerber and was so registered in kindergarten, grammar and high school and Hadley Vocational School. Earliest school records show, "Parent's or Guardian's name: Mrs. Maude Gerber". The grammar and high school records show, "Parent or Guardian: J. H. Manwaring (Uncle)". The Hadley Vocational School records show, "Guardian, H. Manwaring". The application for marriage license, signed by plaintiff and John A. Hegger on December 28, 1943, recites plaintiff's name to be "Madeline A. Gerber" and is so signed by her. Plaintiff always referred to Mr. and Mrs. Manwaring as "Uncle Hart" and "Aunt Mary", and, insofar as the evidence shows, never referred to them as her father and mother or any other appellation denoting a parent and child relationship. Postal cards sent by plaintiff to the Manwarings in 1934, on the occasion of a visit to Texas by plaintiff, address them as "Uncle Hart" and "Aunt Mary" and close with the words, "Love, Madeline".

On March 20, 1943, shortly after the death of Hart Manwaring, Mary L. Manwaring and Madeline Gerber signed a signature card and opened a joint savings account, No. 78,682, in Jefferson-Gravois Bank in the names of "Mary L. Manwaring or Madeline Gerber, either or survivor". On the reverse side of the signature card appear the words, "Transferred from Savings Account No. 71509. Aunt and Niece". On April 16, 1943, Mrs. Manwaring withdrew $2,500 from that account and a notation was made, "Series G War Bonds". On January 3, 1944, following Madeline's marriage, the balance in that account, $760.15, was transferred to a joint account of "Mary L. Manwaring or George F. Kausler, either or survivor".

The records of the McLaughlin Funeral Home show that upon the death of Hart Manwaring on February 22, 1943, Mrs. Manwaring directed the death notice in the newspaper to read, "* * * beloved husband of Mary Manwaring (nee Kausler). Dear uncle of Madeline and Hart Gerber and Philettie Mayfield * * *." The records of that funeral home also show that upon the death of Mrs. Manwaring, on July 30, 1951, her brother, Charles Kausler, directed the death notice to read, "* * * Beloved wife of the late Hart Manwaring, sister of George, Albert, Charles and Irwin Kausler, Dora Huey and Erma Royce. Dear aunt of Madeline Hegger. Our sister-in-law and aunt."

From the time plaintiff entered the Manwaring home, Mrs. Manwaring (and her husband during his lifetime) bestowed loving care upon her and reared, nurtured, educated and guided her with the solicitude and warmth of affection that plaintiff's witnesses epitomized "as though Madeline were her own child". In turn, plaintiff, with affectionate sincerity, obeyed, served, nursed and, after graduation from vocational school, rendered substantial financial aid to Mrs. Manwaring. Some of plaintiff's

witnesses described Mrs. Manwaring as being too possessive and desirous of pre-empting plaintiff's society to the exclusion of others and, especially, desired that she not marry. In any event, Mrs. Manwaring opposed the marriage of plaintiff to John Hegger. Her opposition, said by her to be based upon John's religion and alleged (denied by plaintiff) intemperance, became so extreme that for several months prior to the marriage, in January, 1944, plaintiff, then aged 32 years, left Mrs. Manwaring's home and took up a temporary residence with her sister, Philettie, who had married a Dr. Mayfield. Soon thereafter, plaintiff and Mrs. Manwaring were reconciled, and in 1947 plaintiff and her husband, at the special request of Mrs. Manwaring, took up their residence in the first floor of Mrs. Manwaring's flat, Mrs Manwaring occupying the second floor. In 1950, plaintiff and her husband built a residence and thereafter resided on Warson Road in St. Louis County, at which place Mrs. Manwaring frequently visited them for periods of weeks.

At sometime not shown by the evidence, but apparently subsequent to plaintiff's marriage, Albert Miller, an attorney of the City of St. Louis, prepared a will for Mrs. Manwaring (not introduced in evidence or otherwise accounted for) wherein, as Mr. Miller recalled, she gave plaintiff her property "to take care of [it], pay taxes and keep the property improved, and at her (plaintiff's) death it was to go to four nephews, * * *."

In the late 1940's, Mrs. Manwaring developed epilepsy which progressively worsened and caused her to become depressed and despondent. While at plaintiff's home on Warson Road, she took her own life.

Following probate of Mrs. Manwaring's last will, the remaining brothers and sisters and certain nieces and nephews of Mrs. Manwaring, alleging themselves to be her sole heirs at law, joined in an action against defendant herein to contest the will. Prior to trial of that action, plaintiff, who had not been made a party thereto, filed an application to intervene upon the ground that she was the equitably adopted daughter and sole pretermitted heir of testatrix. The trial court denied her application. She did not appeal from that order. Thereafter, at trial of the will contest on the merits, plaintiff was called and, over objection of defendant, Albert Kausler, testified as a witness in behalf of the plaintiffs and was cross-examined by Albert Kausler's counsel. At the conclusion of the evidence in the suit to contest the will, the trial court directed that the suit be dismissed on the ground there was no evidence to support it.

In addition to the uncontroverted facts above stated, plaintiff's witnesses testified:

Charles Kausler testified: Mary L. Manwaring, deceased, was his sister. "They (the Manwarings) got her (Madeline), I think—well, when they first got her * * * they kept her at intervals. * * * When they kept her altogether was around 1916, I think—when they took her to keep as their own." He heard a conversation between Madeline's mother and the Manwarings relating to Madeline's future. The Manwarings made "arrangements right there that day (at Koch Hospital) they were going to take Madeline as their own."

"Q. When you say 'made arrangements' that is your conclusion. So far as you can recall after those many years, tell the Court as nearly as you can what was said by Mrs. Gerber and Hart Manwaring and Mary Manwaring. A. Well, she said, "Now my little girl will always have a good home.'

\* \* \* \* \* \*

"Q. You say that was the agreement. What did Hart and Mary Manwaring say on that occasion, Mr. Kausler, with regard to taking Madeline as their own child? A. They said they were very happy they had a little girl of their own; that they had no children of their own and were very happy for this child."

Thereafter, Mrs. Manwaring told the witness she had some bonds for Madeline and

that she wanted the witness to sell her property so she could "buy bonds for Madeline, she wanted Madeline to have it all"; and shortly before her death "she threw the keys down to me and she said, 'Sell the place.'"

On cross-examination, the witness admitted that he and the other brothers and sisters brought the aforesaid action against the brother, Albert, defendant herein, to contest Mrs. Manwaring's will and in which action they were represented by one of counsel for Madeline in the instant action. Witness also admitted that no mention was made in the action to contest the will as to Madeline being entitled to any part of the estate; and that when she sought to intervene, she "was ruled out". The witness insisted, however, that had the plaintiffs been successful in the will contest, they would have given "it all to Madeline". Witness also admitted that Madeline "was never adopted" and "didn't say she was adopted". He also admitted that he was present when Mrs. Manwaring's lockbox was opened and that he and his counsel signed the document listing the property found therein and that the only bonds in the box were the seven $500 Series "G" bonds issued to Mary Manwaring and inventoried in her estate.

Mrs. Pauline Kausler, wife of witness Charles Kausler, testified that Mrs. Manwaring always referred to plaintiff as "my girl Madeline". Charles Kausler, Jr., son of Charles Kausler, testified, in substance, as did his mother, Mrs. Pauline Kausler, that Madeline would refer to Mary Manwaring's family as "uncles and aunts".

Mrs. Dora Huey, sister of Mrs. Manwaring, testified: Following the funeral of Madeline's mother, Mr. and Mrs. Manwaring and Madeline, then eight years of age, ate supper at the Huey home. "They" said that Madeline had no mother now and that Mrs. Manwaring was her mother. "We used to say she (Mrs. Manwaring) ought to adopt Madeline. She (Mrs Manwaring) said well, she was her girl, she didn't see why she should adopt her—it cost money." When Madeline and her husband came into Mrs. Manwaring's home, Mrs. Manwaring said Madeline was her daughter—she would always say that.

On cross-examination, Mrs. Huey admitted that at the time the Manwarings took Madeline into their home it was a very common practice for relatives to raise the children of deceased parents and that neither of the other Gerber children reared by relatives were ever adopted.

Sarah McBride, aged 72 years, testified: She was a lifelong friend of Mrs. Manwaring. After Madeline was taken into the Manwaring home, Mrs. Manwaring went to work so that she could educate Madeline. She said, "I want my little girl to know as much as anybody else", and always referred to her as "my Madeline." When Madeline was near forty years of age, the witness went with Mrs. Manwaring to a lawyer's office, where Mrs. Manwaring made a will giving "everything to Madeline"; the will said "to my niece Madeline Hegger * * * but she must never let the Heggers get hold of it." The bonds were to go to Charles Kausler's boys. Mrs. Manwaring also told the witness before Madeline married that she "had her bonds and bank account in Madeline's name". Madeline's name was taken off the bonds because Mrs. Manwaring "didn't like John".

Blanche Juncker, a close friend of the Manwarings, testified: She roomed and boarded with the Manwarings for about ten years. Madeline came into that home while the witness stayed there. Mrs. Manwaring referred to her as "her little girl", and after she was grown would say, "That's my Madeline".

Elsie Scott, a close friend of the Manwarings and Madeline, testified: She asked Mrs. Manwaring "how come she never had any children", and Mrs. Manwaring said, "Why, I have a daughter (Madeline) now; I don't need to have any." The witness also asked Mrs. Manwaring why she never

adopted Madeline and Mrs. Manwaring said, "No reason to. She is my daughter and there is no one would cause me any trouble, or no one to care." The witness never heard Madeline claim that she had been adopted. She did hear Mrs. Manwaring call Madeline "my girl" and on a "couple" of occasions call her "my daughter."

Mathilda Feldman, who worked with Mrs. Manwaring in 1941 and knew her thereafter until her death, testified that she told witness that Madeline was her husband's niece, called her "my girl", and never mentioned adopting her.

Agnes Calvin, who roomed and boarded in the Manwaring home for a number of years, testified: Mr. and Mrs. Manwaring loved Madeline dearly. "She (Mrs. Manwaring) even talked about adopting her, but I don't know why they never did." She told witness many, many times, the last time being shortly before her death, that "they wanted to adopt her, but never went to court to do it."

Harold Blunt testified: He and his wife lived in the same flat with Mrs. Manwaring from 1947 to 1950. During that time Mrs. Manwaring said nothing about adopting Madeline. She told witness that she had made a will and he understood she left the majority of her estate to Madeline, and that the estate consisted of bonds and her house. The witness would not say whether she said or did not say she was "only leaving a life interest to Madeline in the house." Mrs. Neta Blunt, wife of Harold Blunt, testified that Mrs. Manwaring said, "I want Madeline to have what I have, but I don't especially want John to have it." Adoption was never mentioned.

The following evidence was also introduced in behalf of defendant:

Adele Hakenewert testified: She was a forelady for New Era Shirt Company, where Mrs. Manwaring was formerly employed. Mrs. Manwaring referred to Madeline as her husband's niece and never

in any other manner and never mentioned "adoption". In a conversation in connection with Madeline's impending marriage, Mrs. Manwaring said to the witness that "she didn't like it, to think she was marrying this man, being a divorced man, but she said, 'What can I do about it? I am not her mother.' "

Plaintiff's husband, John Hegger, died prior to the trial. Defendant introduced in evidence his testimony at the coroner's inquest held upon the death of Mrs. Manwaring, in which he stated Mrs. Manwaring's relationship to plaintiff herein in this manner:

"Q. Was the deceased related to you? A. She raised my wife.

"Q. No blood relationship there. A. Her husband was my wife's mother's brother."

Before determination of the case on the merits, we will consider plaintiff's contention that the trial court erred in refusing to allow her to testify in her own behalf in the instant case.

When plaintiff was proffered as a witness in her own behalf, defendant objected upon the ground of her incompetency under the so-called "Dead Man's Statute", Section 491.010 RSMo 1949, V.A.M.S. Plaintiff did not question the application of the statute, but contended that her incompetency had been waived by the direct examination and cross-examination of her in the suit to contest the will. Over objection of defendant, plaintiff was permitted to introduce in evidence for inspection of the court her application to intervene in the will contest suit and a transcript of her testimony when she was called as a witness in behalf of plaintiffs in the trial of that action on the merits. After reading both of the exhibits, the trial court held they did not reveal any waiver of her incompetency in the instant case and refused to permit her to testify.

A review of plaintiff's testimony in the action to contest the will shows that, on

direct examination, she testified in substance to the family history set forth in the uncontroverted facts; that Mrs. Manwaring told her she had made a will and that she, plaintiff, was to get the house and the bonds were to go to certain nephews; that as Mrs. Manwaring's illness progressed she became "more despondent" and "just like a different person"; that Albert Kausler borrowed money from Mrs. Manwaring (which he repaid), and that he wanted more money but she would not give it to him; and to other matters, the obvious purpose of which was to show that had Mrs. Manwaring been of sound mind she would not have omitted plaintiff herein from her will and would not have given her entire estate to Albert. She also testified, on direct examination, that at the time of her mother's death (plaintiff was then eight years old), the Manwarings said "I would have a home with them as long as I lived." On direct examination, she was also asked, "Were you ever legally adopted by Mary Manwaring?" To which she replied, "No; I never was legally adopted. They talked to me about it many times. They thought they should. They even talked to me about it, when I was in my teens, in school, and it was agreeable to me. It was one of those things, like people talk about making a will and never get around to it." On cross-examination, she testified:

"Q. Now, you spoke of your aunt telling you about making a will and going to leave the flat (real property) to you. Did you know about this life estate? Instead of leaving it to you you were only to have a life estate? * * * A. It was to be mine as long as I lived. After I died it was to revert back to the estate."

It is difficult to see how plaintiff's testimony, if consistent with her testimony in the action to contest the will, could have been of benefit to her in the instant case. But, be that as it may, we will rule the contention on its merits.

Plaintiff has cited the cases of In re Trautmann's Estate, 300 Mo. 314, 254 S.W. 286, 288; Lampe v. Franklin American Trust Co., 339 Mo. 361, 96 S.W.2d 710, 107 A.L.R. 465; In re Franz' Estate, 344 Mo. 510, 127 S.W.2d 401, 407. They do not aid her. In each of them a witness disqualified under the statute was called and examined by the adverse party. The instant case presents the reverse of that situation. When plaintiff herein was called by plaintiffs and, over the objection of defendant, testified in their behalf in the will contest, she was not a party to the suit and her status was not an issue. In fact, she had, by every fair intendment, abandoned any claim to the estate as an adopted child and, for the time being, at least, had cast her lot with the plaintiffs therein against Albert; as apparently have the plaintiffs in that action cast their lot with plaintiff in the instant action. Neither did defendant, in his cross-examination of plaintiff, go into any matter not covered by her direct examination. It is only where the party insisting upon the incompetency nevertheless cross-examines the witness on new matter not touched upon or brought out on the examination in chief that the incompetency is waived and then only as to such new matter. McCune v. Goodwillie, 204 Mo. 306, 102 S.W. 997; Bussen v. Del Commune, 239 Mo.App. 859, 199 S.W.2d 13, 19. We hold that defendant did not waive plaintiff's incompetency as a witness in this action by his cross-examination of her in the action to contest the will.

The petition does not plead, the substantial evidence does not tend to show, and plaintiff does not here seek equitable enforcement of an oral contract on the part of Mrs. Manwaring to adopt plaintiff. She relies solely upon estoppel to deny an alleged factual adoption. Hence, we consider the case from that viewpoint.

If one takes a child into his home as his own, assumes and performs the duties and burdens incident to parenthood and, in turn, exacts of and receives from

the child the obedience, services, love and duties of a natural child, the courts may, *if justice and good faith require it,* hold such person estopped to deny that he voluntarily assumed the status of a parent and that the child thereby has become the equitably adopted child of such person. Holloway v. Jones, Mo., 246 S.W. 587, 590–591. As above stated, equitable adoption will be decreed only where justice, equity and good faith require it. Rich v. Baer, 361 Mo. 1048, 238 S.W.2d 408, 411. See also Drake v. Drake, 328 Mo. 966, 43 S.W.2d 556, 559 [2]; Taylor v. Hamrick, Mo., 134 S.W.2d 52; Capps v. Adamson, 362 Mo. 539, 242 S.W.2d 556, 559. To relax that important element is to invite fraud and make all persons reluctant to receive unfortunate children into their homes primarily for the welfare of the latter, rather than for the benefit of the persons assuming the burden of their rearing. Benjamin v. Cronan, 338 Mo. 1177, 93 S.W.2d 975, 981; Rich v. Baer, 361 Mo. 1048, 238 S.W.2d 408, 411 [4]. So it is that where equitable adoption by estoppel is sought, the courts examine the evidence with "especial strictness", and the burden is upon the person seeking the decree to establish each and every element necessary to application of the rule by evidence that is so clear, cogent and convincing as to leave no reasonable doubt in the chancellor's mind. Hogane v. Ottersbach, Mo., 269 S.W.2d 9, 11.

■ On this appeal, it is our duty to consider the evidence de novo and to reach our own conclusion, and that we do. But when an issue of fact has been decided by the chancellor upon conflicting evidence, and such finding turns upon the testimony of witnesses who have appeared before him, such finding will be sustained unless clearly erroneous. Miller v. Coffeen, Mo., 280 S.W.2d 100, 101; Kalivas v. Hauck, Mo., 290 S.W.2d 94, 100; Turner v. Mitchell, Mo., 297 S.W.2d 458, 465.

No good purpose would be served by a detailed summary and analysis of the evidence in this case nor by a detailed comparison of the evidence with that in other cases wherein equitable adoption has been either decreed or denied. Each case has its own peculiar facts that either are persuasive or non-persuasive that adoption by estoppel should be decreed. Plaintiff has cited us to many cases and especially the cases of Drake v. Drake, 328 Mo. 966, 43 S.W.2d 556, 560; Menees v. Cowgill, 359 Mo. 697, 223 S.W.2d 412, 416–417; Rich v. Baer, 361 Mo. 1048, 238 S.W.2d 408, 411; Capps v. Adamson, 362 Mo. 539, 242 S.W.2d 556; Hogane v. Ottersbach, Mo., 269 S.W.2d 9, 11; Lukas v. Hays, Mo., 283 S.W.2d 561. We do not find any of them helpful to her. To the contrary, the Rich, Capps and Hogane cases, supra, each of which contains an extended analysis of many of the prior cases dealing with equitable adoption by estoppel, reveal a consistent pattern of refusal to decree adoption by estoppel in fact situations much stronger than those presented by plaintiff in the instant case.

For reasons hereinafter briefly stated, we find ourselves in accord with the finding of the trial court.

First, as to the testimony of the members of the Kausler family: These witnesses, who knew better than anyone else the true status of plaintiff in the Manwaring home, were somewhat discredited by the fact that they, alleging themselves (and the defendant, Albert) to be the sole heirs at law of deceased, sought to void the will and obtain the bulk of Mrs. Manwaring's estate. By not making plaintiff a party to that action they impliedly represented that plaintiff was not entitled to share in the estate; and, yet, at the trial of the instant case they displayed considerable zeal in trying to convince the court of the very fact they inferentially denied in the suit to contest the will. It matters not whether they "about-faced" because they loved Madeline the less or disliked Albert the more. Their testimony is to be evaluated by their performance, whatever their motive.

The written records, public and private, relating to the family status of plaintiff from the time of her entry into the Manwaring home strongly tend to show that Mrs. Manwaring never at any time asserted or assumed the status of an acting or *quasi* parent. To the contrary, every such record directly or inferentially negates any such status. The school, bank and death records definitely show a continuing and unbroken "aunt and niece" relationship. Mrs. Manwaring's last will, in which she obviously remembered and named her "nearest of kin" and omitted the name of plaintiff, with whom she was on intimate terms when the will was written, clearly indicates that she did not consider Madeline "of kin", either as a daughter or otherwise, but only as being related to her by marriage. Neither does the first will, wherein plaintiff was devised only a life estate in the real property, the title in the remainder, together with full title to the bonds, passing to Mrs. Manwaring's nephews, seem to be satisfactorily explained by the testimony that Mrs. Manwaring "did not like John." And it is also worthy of note that when plaintiff's witness Charles Kausler directed the wording of the notice of Mrs. Manwaring's death he referred to her only as "dear aunt of Madeline Hegger", and then summed up Mrs. Manwaring's relationship to both the Kauslers and Madeline with the words "our sister-in-law and *aunt*". In the same connection, consideration must be given to John Hegger's testimony at the coroner's inquest in which he described Mrs. Manwaring's relationship to Madeline simply as "Her husband was my wife's mother's brother."

Furthermore, Mrs. Manwaring had a clear understanding of the change that would be effected in Madeline's status in the event of her adoption. At every occasion when the matter of adoption was broached, it is clear that Mrs. Manwaring, at most, *considered* it, but was never sufficiently impelled to assume such a relationship. Defendant's witness, Adele Hakenewert, apparently wholly disinterested, quoted Mrs. Manwaring as saying of plaintiff's impending marriage, that she did not like it, but, she said, "What can I do about it? I am not her mother."

Plaintiff received much from Mrs. Manwaring at an age when she desperately needed it. True, she gave much in return, but there is no clear, cogent and convincing evidence that Mrs. Manwaring ever assumed or promised to assume the status of a parent or that plaintiff ever assumed or believed herself to be the factually adopted child of Mrs. Manwaring. Consequently, the action must fail. See Capps v. Adamson, 362 Mo. 539, 242 S.W.2d 556.

The conclusion reached herein makes it unnecessary to rule defendant's contention that plaintiff is barred of the relief sought by reason of res adjudicata, laches and the several statutes of limitations.

The finding and judgment of the trial court is affirmed.

All concur.